Mr. Justice DAVIS
 

 delivered the opinion of the court.
 

 This ease is interesting, because of certain novel views which this court is asked to sustain.
 

 
 *615
 
 Two questions arise in it: 1st, was the conduct of Pearson justifiable? 2d, if not, what should be the proper measure of damages? It is contended, as the life of Duane was in imminent peril, in case of his return to San Francisco, that Pearson was justified, in order to save it, in excluding him from his boat, notwithstanding Duane was willing to take his chances of being hanged by the Vigilance Committee.
 

 Such a motive is certainly commendable for its humanity, and goes very far to excuse the transaction, but does not justify it. Common carriers of passengers, like the steamship Stevens, are obliged to carry all persons who apply for passage, if the accommodations are sufficient, unless there is a proper excuse for refusal.
 
 *
 

 If there are reasonable objections to a proposed passenger, the carrier is not required to take him. In this case, Duane could have been well refused a passage when he first came on board the boat, if the circumstances of his banishment would, in the opinion of the master, have tended to promote further difficulty, should he be returned to a city where lawless violence was supreme.
 

 But this refusal should have preceded the sailing of the ship. After the ship had got to sea, it was too late to take exceptions to the character of a passenger, or to his peculiar position, provided he violated no inflexible rule of the boat in getting on board. This was not done, and the defence that Duane was a “stowaway,” and therefore subject to expulsion at any time, is a mere pretence, for the evidence is clear that he made no attempt to secrete himself until advised of his intended transfer to the Sonora. Although a railroad or steamboat company can properly refuse to transport a drunken or insane man, or one whose character is bad, they cannot expel him, after having admitted him as a passenger, and received his fare, unless he misbehaves during the journey.
 
 †
 
 Duane conducted himself properly on the
 
 *616
 
 boat until bis expulsion was determined, and when bis fare was
 
 tendered
 
 to the purser, be was entitled to the same lights-as other passengers. The refusal to carry him was contrary to law, although the reason for it was a humane one. The apprehended danger mitigates the act, but affords no legal justification for it.
 

 But, the sum of four thousand dollars awarded as damages, in this case, is excessive, bearing no proportion to the injury received. Duane is entitled to compensation for the injury done him by being put on board the Sonora, so far as that injury arose from the act of Pearson in putting him there. But the outrages which he suffered at the hands of the Vigilance Committee, his forcible abduction from California and transportation to Acapulco, the difficulties experienced in getting to New York, and his inability to procure a passage from either Acapulco or Panama to San Francisco, cannot be compensated in this action. The obstructions he met with in returning to California were wholly due to the circumstances surrounding him, and were not caused by Pearson. Every one, doubtless, to whom he applied for passage, knew the power of the Vigilance Committee, and were afraid to encounter it, by returning an exile, against whom the sentence of death had been pronounced.
 

 Pearson had no malice or ill-will towards Duane; and, as the evidence clearly shows, excluded him from his boat, in the fear that, if returned to San Francisco, he would be put to death. It was sheer madness for Duane to seek to go back there. Common prudence required that he should wait until the violence of the storm blew over, and law and order were restored.
 

 This course he finally pursued, and he did not return to California until February, 1860. If he believed, when expelled from the Stevens, that Pearson had done him a great wrong, he certainly did not when he filed the libel in this case, for the 12th article is as follows:
 

 “That when libellant was so banished from the State of California, as aforesaid, by the said Vigilance Committee, he was threatened with the penalty of death should he ever
 
 *617
 
 return to said State; that libellant was aware that said committee had caused to be executed a number of persons, without color or warrant of law or right, and that the said committee had the power and ability to put in execution their threats, and libellant believed and had reason to believe from the conduct of said K. H. Pearson as aforesaid, and the treatment he received from the hands of said Vigilance Committee, and their threats as aforesaid, which were well known to said Pearson, that should he return to said State, his return, if attempted or if successful, would be impeded and resisted, and his life put in peril and jeopardy, which belief existed up to the time of his departure from New York to California.”
 

 This is the sworn statement of Duane, that his life was in peril if he returned to California at an earlier day, for the conduct of Pearson, to which he refers, was predicated on a corresponding belief.
 

 It is true, this article in the libel was introduced, by way of excuse, for not having sooner brought the suit, but the admissions in it are proper evidence for all purposes. If so, it is clear that the legal injury which Duane suffered at the hands of Pearson, can be compensated by a small amount of money. On a review of the whole case, we are of opinion that the damages should be reduced to fifty dollars.
 

 It is ordered that this cause be remitted to the Circuit Court for the District of California, with directions to enter a decree in favor of the appellee for fifty dollars. It is further ordered that each party pay his own costs in this court.
 

 Order acoordingly.
 

 *
 

 Jencks
 
 v.
 
 Coleman, 2 Sumner, 221; Bennett v. Dutton, 10 New Hampshire, 486.
 

 †
 

 Coppin v. Braithwaite, 8 Jurist, 875; Prendergast
 
 v.
 
 Compton, 8 Carrington and Payne, 462.