### MEYER v. ST. LOUIS, I. M. & S. RY. CO. et al.

#### (Circuit Court of Appeals, Eighth Circuit. January 27, 1893.)

#### No. 153.

**1. CARRIERS—INSANE PASSENGER—INJURY TO FELLOW PASSENGER.**
On trial of an action against a railroad company and a sleeping-car company to recover for the death of plaintiff's intestate, there was proof that deceased, a passenger, while seated in a sleeping car, was approached by an insane person, who made a remark, overheard by the sleeping-car conductor, that "It's a sad thing that they are trying to kill me, and I am a defenseless man," and that shortly afterwards he shot deceased, thereby causing death; that such insane person was recognized by the conductor and porters of the sleeping car as having been transported over the line 19 days before, at which time he was in chains, violent, in charge of police officers, laboring under a delusion of pursuit by Jews, and expressed regret at having no gun to protect himself. At the time of the shooting he was unattended, and prior thereto had frequently stated to a number of persons that he was pursued by Jews who were trying to kill him, and that he was defenseless. The proof further showed that he had a dull, heavy, and sullen look, which might indicate insanity, and had applied to the conductor of the train for protection. *Held*, that an instruction that the defendant railroad company had no right to refuse transportation "on suspicion that such person was dangerous to others from insanity, or any other cause, if such person, at the time of offering to become a passenger, was apparently harmless, and conducted himself in no way different from other passengers applying for passage," was reversible error, as the jury might fairly infer therefrom that defendant was bound to receive an apparently harmless passenger, though it knew that he was insane in fact, or had grounds of suspicion that by reason thereof he might be dangerous.

**2. SAME—DUTY OF CARRIER—INSTRUCTIONS.**
In such a case the degree of care imposed upon the carrier is the highest, and an instruction that the railroad company was bound to use the utmost care and diligence that prudent and careful men should have exercised is erroneous, in comparing the carrier's legal obligation with any degree of care required of prudent men.

**3. SAME.**
In such a case a judgment in defendant's favor should be reversed, where, after proper request, the court failed to properly instruct the jury as to the duty and obligation of defendant railway company, or to affirmatively instruct the jury that if the company became chargeable, through its employes, with knowledge of the condition of the insane passenger, it had the right, and it might be its duty, to place him under guard or restraint, or remove him from the cars, if such action was necessary for the protection of the other passengers.

**4. SAME.**
An instruction that the carrier was not obliged to provide guards or means of restraint or confinement, in anticipation of passengers becoming suddenly insane, or that, if the event occurred after the passenger had begun his journey as an apparently sane person, it would be the duty of

the carrier to refuse to carry him further than necessary to place him in charge of an officer of the law, and to use all reasonable care to prevent injury to passengers by him in the meantime, places too narrow a limit upon the power and right of the carrier in dealing with insane persons on its trains.

**5. SAME.**

An instruction limiting the carrier's right to exercise physical restraint over, or eject, an insane person, to cases wherein the conduct of the insane person indicates that he will probably do violence to those about him, does not adequately inform the jury of the carrier's power and right, as a reasonable possibility as well as a probability of danger may require action.

**6. SAME**

Nor are the carrier's duty and obligation properly defined by an instruction that the law did not justify restraint if the insane person was neither violent in word or act, and the only outward indications of insanity were expressions of fear and apprehension of violence, as the jury might infer that no physical restraint could be exercised so long as the insane person remained quiet.

**7. SAME.**

The railroad company would not be negligent, by reason of nonaction, if its employes, exercising the high degree of care demanded of them, could not have reasonably anticipated the effect of failure to restrain or eject such insane passenger.

**8. SAME.**

To charge the defendant railway company with the duty of restraint, it need not necessarily have been foreseen that the killing would take place unless for such restraint. If a reasonable possibility of injury to any of the passengers could have been foreseen, the obligation arose to take proper action for their protection, although it could not be anticipated which one of the passengers might be injured by such insane person, nor whether his violence would cause death or not.

**9. SAME—SLEEPING-CAR COMPANIES.**

Instructing the jury that the sleeping-car company was not a common carrier, but failing to charge that such company had the right to restrain or eject the insane passenger, was erroneous, in that, from the entire charge, the jury might naturally infer that such company's rights were even more limited than those of the railroad company.

In Error to the Circuit Court of the United States for the Eastern District of Arkansas.

At Law. Action by Sallie Meyer, as administratrix of Isador Meyer, deceased, against the St. Louis, Iron Mountain & Southern Railway Company and Pullman's Palace Car Company, to recover for the killing of said Isador Meyer by an insane fellow railway passenger. Verdict and judgment for defendants. Plaintiff brings error. Reversed.

Statement by SHIRAS, District Judge:

This case comes before this court on a writ of error to the United States circuit court for the eastern district of Arkansas, and the facts material to an understanding of the questions arising on the record are set forth as follows in the bill of exceptions contained in the record:

"During the trial of the case evidence was introduced on the part of the plaintiff to show that on the 28th day of January, 1891, John W. Graeter was in an insane condition in the city of Ft. Worth, Tex., having displayed there, within a day or so previous, homicidal tendencies. That on the day last aforesaid, upon a telegram received from his brother, living in Vincennes, Ind., the said Graeter had been arrested, and put in confinement at Ft. Worth, and was sent in charge of two policemen, with chains around his

ankles, and handcuffs on his hands, over a line of railway extending from Ft. Worth to the city of St. Louis, Mo., including the line of the defendant railway company, which extends from Texarkana to St. Louis. That said Graeter was thus transported in irons, and that during the time he was on the train of the defendant railway company he was violent, and imagined that he was being pursued by Jews. That he frequently expressed a regret that he did not have a gun with him, to protect himself. That it was difficult to keep him in his seat, and that at one time the conductor of the train telegraphed to the station ahead for a doctor to administer medicine to Graeter. That he was accordingly treated by the doctor.

"That on the 16th day of February, 1891, about 9 o'clock P. M., he came to the train of the defendant railway company at St. Louis, in company with two persons unknown, one of whom entered the car with him, and talked with him a few minutes before the train started. That during the evening and the subsequent day he frequently talked about Jews, and complained that they were·pursuing him, and trying to kill him, and said that he was defenseless.

"That when Graeter was taken north to St. Louis, in January, the conductor on the Pullman sleeping car attached to the passenger train in which Graeter was being carried, though on another car, was the same conductor who had charge of the sleeping car upon which Graeter took passage on the evening of February 16th, and that he had notice of the insanity of Graeter at the time that Graeter was going on his first trip, and also when he was going south on his second trip. That when Graeter got on the train to go south, on the last-named trip, he was recognized by said sleeping-car conductor, whose name was Leach, as being the same person who had been taken northward in January, in irons, as an insane person, and that the porters in the sleeping car also recognized him as being the same person.

"That deceased, Meyer, on the same day, came from Memphis to Bald Knob, in the day car, over the line belonging to said defendant railway company. That when Meyer got to Bald Knob he changed his car, and got on the sleeper, where Graeter was; the sleeper at that time not being in motion. That he took with him into the sleeper his valise and walking cane, first remarking to a fellow passenger on the day car, ' that he was going to leave that car, and go into the sleeper, because the car that he was then in was too much crowded.' That after he got on the sleeper he washed himself, sat down, and gave an order to the porter for something to eat. That the porter went to the buffet for the purpose of preparing the meal ordered by Meyer, and that, while Meyer sat there, Graeter came up to him, and said, 'It's a sad thing that they are trying to kill me, and I am a defenseless man.'

"There was also evidence tending to show that this remark was heard by Leach, the conductor. That soon afterwards, and while Meyer was reading a paper, Graeter took a seat immediately behind him, drew his pistol, and shot Meyer through the head, producing a wound from which Meyer afterwards died. That Graeter immediately walked to the rear end of the car, which had started on its journey before Meyer was shot, and that finding Leach, the conductor, on the rear platform of the car, he shot him, and killed him. That the train was thereupon stopped, and that soon afterwards Graeter was taken into custody, was proved to be insane, and was sent off to an asylum. There was some conflict in the testimony as to whether Graeter's insanity was delirium tremens, produced by the excessive drinking of intoxicating spirits, or whether it was of a more permanent character. There was also evidence tending to show that, while Graeter was on the train going south from St. Louis, he had a dull, heavy, and sullen look, which might indicate insanity, as well as the fact that he complained to a number of persons that he was in danger from Jews who he imagined were pursuing him. That he told the conductor of the train he was a defenseless person, and claimed his protection, offering to show him letters of recommendation, and that the conductor told him that he would protect him."

The jury returned a verdict in favor of the defendants, and the plaintiff brings the case to this court.

U. M. Rose, W. M. Beckner, and G. B. Rose, (Beckner & Jouett on the brief,) for plaintiff in error.

George E. Dodge and S. Johnson, for St. Louis, I. M. & S. Ry. Co., defendant in error.

Percy Roberts, for Pullman's Palace Car Company, defendant in error.

Argued before CALDWELL and SANBORN, Circuit Judges, and SHIRAS, District Judge.

SHIRAS, District Judge, (after stating the facts.) In considering the questions arising on the errors assigned in this record, we deem it best not to take them up in the order followed in the assignment of errors and in the briefs of counsel, believing that a clearer understanding of the questions involved can be had if we follow the sequence of the events that gave rise to this controversy.

In the petition it is averred that the defendant companies had knowledge of the insane condition of John W. Graeter when he sought to become a passenger on the train leaving St. Louis on the evening of February 16, 1891. Assuming that there was evidence to be submitted to the jury, tending to support this charge of knowledge on part of the defendants, the first question arising upon the facts was that touching the duty and rights of the railway company when Graeter sought to become a passenger upon the train. The claim on behalf of the plaintiff was that as Graeter was then an insane person, the company had the right—and, if the company was chargeable with knowledge of his insane condition, it became its duty, for the protection of the other passengers—to refuse to accept him as a passenger. The defendant railway company denied knowledge of Graeter's condition when he was admitted as a passenger upon the train. If, upon the evidence, the jury should find that at the time Graeter became a passenger the railway company was not chargeable with knowledge of his insane condition, then it would not be possible to hold that the company was derelict in its duty in merely permitting him to take passage on the train; and the jury would not, in such case, be called upon to consider either the right or duty of the company to refuse to accept him as a passenger. If, however, the jury, under the evidence, should find that the railway company was chargeable with knowledge of Graeter's insanity at the time he sought passage on the train, then the question of the right and duty of the company under such circumstances would properly arise. Upon this aspect of the case the court charged the jury as follows:

"(5) The jury are instructed that the defendant railway company was at the time of the occurrence in question a common carrier of passengers; that, as such common carrier, it was its duty to receive upon its trains all persons who apply for passage, and pay, or offer to pay, the usual and customary fare; and that such carrier would have no legal right to refuse such transportation to any one on mere suspicion that such person was dangerous to others, from insanity or any other cause, if such person, at the time of offering to become a passenger, was apparently harmless, and conducted himself in no way different from other persons applying for passage."

From the language used in this instruction the jury might fairly infer the law to be that a common carrier was bound to receive as

a passenger a person who offered to pay the proper fare, if he at
that time was apparently harmless, even though the carrier knew he
was in fact insane, or had grounds for suspicion that such person,
by reason of his insanity, might be dangerous to others upon the
carrier's vehicle. Clearly this is not the law. It is well settled that
a common carrier is not obliged, as a matter of law, to receive as a
passenger an insane or drunken person, or one whose physical or
mental condition is such that his presence upon the vehicle of the
carrier may cause injury or substantial discomfort to the other pas-
sengers. Wood, Ry. Law, 1035; Putnam v. Railway Co., 55 N. Y.
108; Pearson v. Duane, 4 Wall. 605. In the latter case the su-
preme court states the rule to be that—

"Common carriers of passengers, like the steamship Stevens, are obliged to
carry all persons who apply for passage, if the accommodations are sufficient,
unless there is a proper excuse for refusal. If there are reasonable objec-
tions to a proposed passenger, the carrier is not required to take him."

The law imposes upon a common carrier the duty of exercising
a very high degree of care and foresight for the safe transportation
of the passengers who intrust themselves to him for that purpose;
and in the performance of this duty, which the carrier cannot evade
or escape from, the carrier certainly has the right to exclude from
his vehicle any one whose condition is such that a possibility of
danger may be thrown upon the other passengers if he is admitted
as a passenger. It would cast an unjust burden on the carrier to
hold, on the one hand, that he must exercise the highest degree of
care and caution for the protection of his passengers, and, on the
other hand, to hold that he has not the right to exclude from his
vehicle one whose condition is such that he may cause danger to the
other passengers, simply because, at the moment he offers himself
as a passenger, he is quiet, well-behaved, or apparently harmless.
The fact is made clear, beyond dispute, that when Graeter took
passage on the railway train, on the evening of February 16, 1891,
he was then a dangerous lunatic, liable at any moment to be seized
with a homicidal frenzy; and he was therefore a wholly unfit person
to be at large, or to take passage on a railway train, unaccompanied
with proper attendants to restrain him from injuring others. The
railway company, in view of the undisputed facts of the case, had
unquestionably the legal right to refuse to accept Graeter as a,
passenger; and, if it had knowledge of his actual condition, it was
derelict in its duty, in consenting to accept him as a passenger
without taking sufficient precautions to protect the other passengers
from his murderous attack. In its application to the facts of this
case, the instruction we are considering is faulty and misleading, in
that it improperly limits the right of a common carrier to refuse to
accept an insane person as a passenger, and fails to state clearly
what the duty of the carrier would be in case a person known to the
company to be insane offers himself as a passenger, unaccompanied
by friends or attendants. Having been accepted as a passenger,
then the railway company, as soon as it became chargeable with
knowledge of Graeter's insane condition,—whether that knowledge
was acquired before or at the time he became a passenger, or from his

acts subsequent to the beginning of the journey,—was charged with the duty of exercising proper care for the protection of the other persons upon its train.

In defining the measure of care required of the company under these circumstances, the court ruled as follows:

"The defendants in this case were bound to use the utmost care and diligence that prudent and careful men, skilled in the discharge of the duties of their employes were engaged in, should have exercised to protect the plaintiff's intestate from any and all assaults that might be made upon him by any one while he was a passenger upon the train, or on the cars of the defendants, or either of them; and if they, or either of them, failed to exercise such care, and by reason of such failure he was killed, then the jury should find for the plaintiff, in such sum as the testimony in the case warrants, not exceeding the amount sued for."

The degree of care demanded of a common carrier or other person in the performance of a duty to another is defined by the law. What a party should do to fulfill the degree of care the law imposes upon him, under given circumstances, is ordinarily a question of fact, for the determination of the jury. It is therefore the duty of the court to instruct the jury as to the degree of care required of the party to the particular case, in order that the jury may determine whether the obligation which the law imposes has been fairly met. A common carrier of passengers is bound to exercise, for the protection of his passengers, a higher degree of care and foresight than is imposed upon persons not engaged in that business. In the instruction given by the court the statement is that the defendants were bound to use the utmost care and diligence that prudent and careful men should have exercised to protect the plaintiff's intestate from any and all assaults that might be made upon him by any one while he was a passenger on the train. The jury were not instructed that, as a common carrier of passengers, the railway company was bound to the exercise of the highest degree of care. The instruction was that the company was bound to use the utmost care that prudent men should exercise. The care that prudent men should exercise is dependent largely upon the relation they occupy towards the person to whom the exercise of care is due. Degrees of care may be predicated of one who is a common carrier, or of one who is not, but cannot be of prudent men; for the law does not cast upon prudent men any particular degree of care, nor the duty of exercising any greater care than is imposed upon men in general. The degree of care imposed by the law is determined by the relation existing between the parties, as that of carrier and passenger, master and servant, and the like, but not by the character of the individuals occupying the relations named. The instruction, therefore, wholly fails to give to the jury the test to be applied in determining the question of negligence on the part of the railway company. In no part of the charge did the court give any other definition of the degree of care demanded of the company in the performance of its contract of transportation than that contained in the instruction last quoted. Counsel for plaintiff submitted an instruction which correctly defined the degree of care demanded of the railway company as a common carrier of passengers; but the court refused to give it, substituting therefor the charge we are now considering, which, in our

judgment, fails to state with clearness and accuracy the degree of care imposed by the law upon the railway company.

Taking the charge given to the jury in its entirety, it is open to the criticism that it fails to properly inform the jury of the duty and obligation resting upon the railway company.   The charge is largely devoted to instructing the jury that the company had not the legal right, or was not called upon, to do this or that; but it fails to state what the company had a right to do, provided certain conditions of fact were found by the jury to exist.   Thus the evidence proved that Graeter was violently insane some weeks before February 16th, and that, when he sought passage on the railway train at St. Louis, he had not recovered therefrom.   There was also evidence tending to show that knowledge of his insanity, and of the delusions to which he was subject, was brought home to the conductor and other employes on the train, possibly on the evening of February 16th, and certainly before the train reached Bald Knob station, the next day, being the place were Meyer got on the train.   The court did not affirmatively instruct the jury that if the company became chargeable, through its employes, with knowledge of Graeter's insane condition, it had the right, and that it might be its duty, to place Graeter under guard or restraint, or to remove him from the cars, if such action was required for the protection of the other passengers from possible harm.   On the contrary, every paragraph of the charge contains a limitation, expressed negatively, either upon the right of the company to act, or upon its duty to act.   The evidence fails to show that the company took any action for the protection of the other passengers until after Meyer was killed, and the character of the charge, in that it negatived the right and duty of the company in so many particulars, must have impressed the jury with the belief that the facts proven were not sufficient in law to confer upon it the right to take any steps whatever for restraining, guarding, isolating, or removing the insane person previous to the killing of Meyer, and that all the company could lawfully do was to wait and see what might happen.   Upon this question of the right of the company after it had knowledge of Graeter's insanity, the court, at the request of the defendants, gave the following instructions:

"(6) The law does not require of a common carrier to provide keepers, or other means of restraint or confinement, in anticipation of one of its passengers becoming suddenly insane while on his journey. If such event occurs after the passenger has begun his journey as an apparently sane person, it would be the duty of the carrier to refuse to carry such passenger any further than was necessary to place him in charge of some county or municipal officer, and to use all reasonable care to prevent his doing injury to other passengers in the meantime.

"(7) Nor even then would the carrier be justified in binding such person, or putting him under physical restraint, or off the train, unless forewarned by such conduct, as would reasonably indicate to prudent persons that such passenger would probably do violence to those around him. If, on the contrary, such passenger was neither violent in word or act, and the only outward expression of a disordered mind was an expression of fear and apprehension of violence from others, which apprehension was apparently removed when assured that his fears were groundless, the carrier would not have been justified, in law, in exercising any physical restraint over such passenger.

"(8) The law does not require of the carrier that it do more than to protect its passengers from dangers and annoyances which are the usual and reasonable results of a given condition of affairs; and if the jury find from the evi-

dence in this case that a person of ordinary prudence would not have anticipated or reasonably apprehended that a failure to eject Graeter from the train, or to physically restrain him, would result in his suddenly killing one of his fellow passengers, then the defendant carrier is not guilty of negligence, and the plaintiff cannot recover.

"(9) And if the jury find from the evidence that the killing of Meyer by Graeter, under the circumstances, was an occurrence of such an unusual, rare, and unexpected character as would not have been looked for or anticipated by a prudent person as the direct consequence of a failure to restrain Graeter beforehand, then it was not a danger of such character as the law requires a carrier to protect its passengers against. Consequently the omission or failure of the carrier to guard against such an occurrence would not be negligence for which the carrier would be liable or answerable."

It cannot be disputed that Graeter's insanity was such that he ought not to have been permitted to travel, unattended and unguarded, upon railway passenger trains. If the defendant railway company became at any time chargeable with knowledge of Graeter's actual condition, then certainly the company would be charged with the duty of doing whatever a high degree of care would demand for the protection of the other passengers upon the train. If the evidence failed to show that the company had become chargeable with knowledge of Graeter's actual condition at any time before the killing of Meyer, then no ground would exist for holding it responsible for the consequences of Graeter's act; but from the time the company had become chargeable with knowledge of his condition, then the obligation rested upon the company to do whatever was reasonably within its power for the protection of the others upon the train. Under such circumstances the company owes a duty to the insane passenger, as well as to the others; and what action should be taken is, of course, dependent largely upon the circumstances of the particular case. If the safety and reasonable comfort of the other passengers will not be imperiled thereby, the company may carry the insane person to the end of his journey, or he may be removed from the train at the first station where he may be properly cared for; but whether he be carried on the train a longer or a shorter distance, the company is bound, so long as he is on the train, to do whatever, in the way of restraint or isolation, is reasonably demanded for the safety and comfort of the other passengers.

The sixth and seventh instructions given by the court are open to a construction which would place too narrow a limit upon the power and right of the carrier in dealing with an insane person upon its trains. In the seventh charge the right of the carrier to exercise physical restraint over or to put an insane person off the train is limited to cases wherein the conduct of the insane man indicates that he will probably do violence to those about him. In the performance of its contract of transportation with the other passengers, the carrier is under obligation to use a high degree of care, and a reasonable possibility as well as a probability of danger may call for action on part of the carrier. Furthermore, in the seventh charge it is said that the carrier would not have been justified, in law, in restraining the insane person, if he was neither violent in word or act, and the only outward expression of a disordered mind was an expression of fear and apprehension of

violence. The jury might well infer from this statement that the law forbade the carrier from exercising any physical restraint over an insane person, so long as he remained quiet, whereas, if the carrier knows that in fact the person is violently insane, and may at any moment do violence to others, it is justified, and in fact it may be its imperative duty, to exercise proper restraint, although at the time the person may be quiet, and apparently harmless; and it is for the jury to decide, under the evidence, what the situation demands of the carrier, in the performance of its legal duty to the other passengers.

In the eighth charge it is said that if a person of ordinary prudence would not have anticipated that a failure to eject Graeter from the train, or to restrain him, would result in his suddenly killing one of his fellow passengers, then the company could not be charged with negligence. The better statement would have been that if the employes of the defendant company, in the exercise of the high degree of care demanded of them, could not have reasonably anticipated that the failure to eject or restrain Graeter might result in his doing injury to his fellow passengers, then the nonaction of the company could not be held to be negligence.

In the ninth charge it is stated that, if the killing of Meyer by Graeter was an occurrence of such unusual character as would not have been anticipated as a direct consequence of a failure to restrain Graeter beforehand, then the company was not required to guard against the same. In order to charge the company with the duty of restraining Graeter, it was not necessary that it should foresee that if Graeter was not restrained he would kill Meyer. If the situation was such that the company should have foreseen a reasonable possibility of injury being caused to any of the passengers by the presence of Graeter on the train, then the obligation to take proper action for the protection of the passengers arose, although the company could not possibly anticipate which one of the passengers might be injured by Graeter in case he was not restrained, nor whether his violence would cause death or not.

It is not necessary to examine each one of the instructions that were excepted to, and the giving of which is assigned as error. What has been already said is sufficient to show in what particulars we deem the instructions given to the jury to be insufficient, and in some degree misleading. So far we have considered the case as though the railway company was the sole defendant.

In defining the duty and obligation resting upon the Pullman's Palace-Car Company, the court, at the request of that company, gave the following instruction:

"The court instructs the jury that Pullman's Palace-Car Company, one of the defendants herein, is not a common carrier, and is not burdened with the heavy and exceptional obligations of a common carrier, for the protection of its passengers from injury; that the extent of its obligation for the protection of its passengers from injury is to maintain a reasonable watch to protect those passengers from any known danger reasonably probable to arise under the circumstances."

It has been repeatedly held that sleeping-car companies are not ordinarily either common carriers of passengers nor innkeepers.

The character and extent of the obligations resting upon them have not yet been defined with exactness, and may in some particulars be dependent upon the relation existing between them and the railway company upon whose line their cars are used. As the record now is in this case, we do not deem it advisable to enter upon the consideration of the relation existing between Meyer and the Pullman Company, it being sufficient to say that assuming, without so deciding, that the instruction last quoted correctly states the extent of the obligation resting upon the sleeping-car company, nevertheless the court did not instruct the jury that the company had the right, if need arose, to restrain or eject from the car an insane person, and the jury would naturally infer from the entire charge that the rights of the sleeping-car company were in this particular even more limited than those of the railway company. For these reasons the judgment must be reversed as to both defendants.

During the introduction of the evidence on the trial of the case the plaintiff offered the deposition of Orpheus Evarts, the medical superintendent of the Cincinnati Sanitarium, a private hospital for the care of insane persons, to which hospital Graeter was taken on the 4th of March next after the killing of Meyer, which was excluded on objection made by the defendants. The testimony of the witness tended to show Graeter's condition while he was at the hospital, but, in reply to the question whether he could state whether Graeter's insanity preceded the occurrence on the train, he answered that he could not. If the testimony would throw any light upon the question of Graeter's mental condition prior to February 16, 1891, then it would be admissible, because the defendants, in their answers, denied that his insanity antedated that time. The mere fact that the witness did not see Graeter for some two weeks after the time Meyer was killed would not necessarily render his testimony inadmissible. If by reason of his knowledge he was an expert in mental diseases, and could give an intelligent opinion as to the probable length of time that Graeter's insanity had existed, his testimony would have been competent; and therefore the objection taken, that the knowledge of the witness was not acquired until after the date of Meyer's death, was not well taken. We are not, however, prepared to say that the objection of immateriality was not well founded. The trial court was in a position to better judge, in view of the whole evidence adduced, which is not before us, whether the testimony would throw any light upon the matters in dispute or not. So far as we can now see, the court might have admitted the testimony without impropriety, but we are not prepared to say that it was clearly error to reject it.

For the errors pointed out in the instructions given the jury, the judgment is reversed, at cost of defendants in error, and the case is remanded to the circuit court, with instructions to grant a new trial.