## OWENS v. MACON AND BIRMINGHAM RAILWAY CO.

1. The right of other travelers to a safe and comfortable passage warrants a carrier in refusing to receive one who has been adjudged a lunatic, and who, though in charge of attendants, is loudly cursing and using obscene language at the time of boarding the car.
2. Common carriers can not absolutely refuse to transport persons who are insane, but may in all cases insist that they be properly attended, safely guarded, and securely restrained.
3. Where it becomes necessary to transport a lunatic, who by reason of his violence may endanger the safety or interfere with the comfort of other travelers, the carrier is entitled to seasonable notice in order that it may make proper arrangements for his transportation.

Argued November 21,— Decided December 12, 1903.

Action for damages. Before Judge Harris. Troup superior court. May 7, 1903.

John B. Owens sued for an alleged tort of the railway company in requiring him to leave a passenger-train, with a lunatic of whom he was in charge. The court directed a verdict for the defendant, and the plaintiff excepted. The following facts appear from the evidence: The plaintiff's brother, Josh Owens, was adjudged to be a lunatic, and it was ordered that he be committed to the State Sanatorium at Milledgeville, and the plaintiff and one Florence were appointed as guards to take him to that place. They handcuffed him and took him to Mountville, a station on the defendant's railway, for the purpose of going on the train to Macon, and thence to Milledgeville. The defendant's agent at Mountville, who was a member of the jury which had declared Josh Owens to be a lunatic, saw them at the station, and sold the plaintiff three first-class tickets for passage on the train. When the train arrived, the plaintiff and Florence started towards one of the passenger-cars with the lunatic but the conductor in charge of the train told them not to take him in there, but to take him into another car, indicating the one assigned to colored passengers, and said, "If he is violent, I can't carry him at all." The plaintiff and Florence then proceeded, with the assistance of others, to put the lunatic on the car indicated, he all the while resisting violently. When they got him on the top step of the car-platform, the general manager of the railway company came up and ordered them to take the lunatic off the train. Florence assured the general

manager that if they were allowed to remain on the train, the lunatic would be "as quiet as anybody;" whereupon the lunatic, who (according to the plaintiff's evidence) had up to that time said nothing, began to curse, and said, "I'll be damned if I will." After they were ordered off the train the guards requested to be allowed to take the lunatic into the baggage-car, but the request was refused. During the time he was on the train the lunatic was securely handcuffed. He was weak and emaciated, and the guards were strong and robust. The defendant had theretofore carried lunatics on the passenger-train, and had never refused to accept that class of passengers, when they were secured and guarded. After this train had left Mountville, the general manager offered to take the lunatic on a freight-train. This offer was declined, on the ground that the freight-train "did not make connection." There was evidence on the part of the defendant as follows: There were only two passenger-coaches in the train,—one the "ladies' coach," which had a partition in it, cutting off a smoking compartment. All the seats of the smoking compartment were occupied by passengers. The other coach had a compartment for colored passengers, in which was a colored woman, and the other part of that coach was used as an express car. It was against the rules of the railway company for passengers to ride in the express car. Several ladies were in the ladies' coach, and one of them seemed to be in an advanced state of pregnancy. The windows of the car were open, and they could hear what was said by the lunatic. He used both profane and obscene language, and threatened to kill one of the guards. One of the men assisting him on the train was kicked by him in the region of the heart. The conductor offered to redeem the tickets. The general manager offered to take the lunatic on the passenger-train the next day, if they would give him enough morphine to quiet and subdue him. The general manager returned to Mountville on an engine, and told a brother of the lunatic, and others, that they might take the lunatic on a freight-train, standing there, that would make connection at Macon with the train for Milledgeville, and proposed to carry him in the cab.

*H. A. Hall,* for plaintiff, cited 14 Lea (Tenn.), 128; 42 Miss. 607; 52 Minn. 296; 33 Kan. 543; 54 Fed. 116; 89 Va. 643;

Civil Code, §§ 5331, 2267; *Ga. Rep.* 58/461; 89/503 ; 97/484; 98/495 ; 101/684 ; 107/757.

*L. F. Garrard* and *Longley & Longley,* for defendant, cited Penal Code, § 902 ; 5 Am. & Eng. Enc. L. (2d ed.) 537, 541 ; Ray on Negl. 163, 223–4, 360.

LAMAR, J.    This was a suit by one of the guards in charge of a lunatic ; but it was conceded on the argument here that he could not recover if the company was justified in refusing to transport the lunatic, and we shall therefore consider what was the carrier's obligation to the insane man.    The relation of carrier and passenger creates reciprocal duties.    One is bound safely to transport ; the other to conform to all reasonable regulations, and so to conduct himself as not to incommode other passengers, who have an equal right to a safe and comfortable passage.    Those who so act as to be obnoxious may be refused transportation, or ejected.    The payment of fare and the possession of a ticket do not require the carrier to transport those who are noisy or boisterous, or who threaten the safety or occasion inconvenience to others on the train.    But in the case of unfortunates who are not responsible for their disorderly conduct, and who at best are involuntary passengers, a different question is presented, calling in each case for the exercise of a wise discretion.    On the one hand regard must be had for the safety and comfort of other travelers, and on the other to the fact that in losing his mind the lunatic has not lost the right to be transported.    It may be vitally important that he be taken to a place where he can receive the attention and confinement rendered necessary by his mental state.    The carrier can not absolutely refuse transportation to insane persons, but it may in all cases insist that they be properly attended, safely guarded, and securely restrained.    And even where such precautions have been taken, it is not bound to afford them, if violent, transportation in the cars in which other travelers are being conveyed.    And while there may be cases in which the convenience of other passengers should yield to the necessities of the unfortunate, the company may decline to receive one who at the time of entering the train exhibits signs of violence which indicate that his presence and conduct would tend to the manifest annoyance of others.    So to do would ordinarily be better than to receive him on the prom-

ise of his attendants that he would be quiet, and, on the disorder continuing, force upon the carrier the duty of deciding whether he should be ejected at a station where there might not be proper accommodations.  Where, however, it becomes essential to transport one who, though violent and noisy, is not responsible for his actions, the company is entitled to seasonable notice in order that it may make proper arrangements.  The action of the defendant in the present case, in offering transportation on a later train whereon others would not be incommoded, was in strict fulfillment of its double duty to the lunatic and the general public.  It could not be required to place him in the baggage-car, which was not intended for passengers.  If the attendants were unwilling for him to be taken in the cab of the freight-train, they were at least bound to give the carrier an opportunity to make other arrangements.

We find no authority directly in point, though the following cases bear more or less on the question raised.  *Peavy* v. *Georgia R. Co.*, 81 *Ga.* 485; Atchison R. Co. v. Weber, 33 Kan. 543, 52 Am. Rep. 543; Paddock v. Atchison R. Co., 37 Fed. 841; Croom v. Chicago R. Co., 52 Minn. 296; Louisville R. Co. v. Sullivan, 81 Ky. 624; Willets v. Buffalo R. Co., 14 Barb. 585; Meyer v. St. Louis Ry. Co., 54 Fed. 116; Pittsburg R. Co. v. Van Dyne, 57 Ind. 576; Lemont v. Washington R. Co., 1 Mackey, 238, 47 Am. Rep. 238, 1 Am. & Eng. R. R. Cas. 263; Vinson v. Middlesex R. Co., 11 Allen 304, 87 Am. Dec. 714; Robinson v. Rockland R. Co., 87 Me. 387; Pearson v. Duane, 4 Wall. 605.

Although the ticket agent was on the jury inquiring as to the lunacy of Owens, and had notice of his mental state, the latter was not exhibiting any signs of violence when the ticket was sold; and though the company was accustomed to convey persons insane, it was not bound to admit to its cars one boisterous, cursing, and using obscene language at the time.  There was no error of law committed, and the verdict was demanded by the evidence.

*Judgment affirmed.  All the Justices concur.*