**Robert F. WILLIAMS, Plaintiff,**

v.

**TRANSWORLD AIRLINES, INC., Defendant.**

**70 Civ. 314.**

United States District Court, S. D. New York.

Jan. 24, 1974.

Melvin L. Wulf, New York City, for plaintiff c/o American Civil Liberties Union.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant; Harold L. Warren, Jr., New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

LEVET, District Judge.

This is a diversity action brought by plaintiff, Robert F. Williams (hereinafter "Williams") against Transworld Airlines, Inc. (hereinafter "TWA"), defendant. Plaintiff alleges citizenship in the State of Michigan; defendant has its principal place of business in New York City, New York. Jurisdiction is also claimed by virtue of 28 U.S.C. § 1331, in that the action is said to arise under the statutes and the Constitution of the United States. Defendant is a common carrier engaged in the business of transporting passengers for hire between various points, including London, England and Detroit, Michigan. The complaint alleges that plaintiff is a black man, who was unjustly and unreasonably discriminated against for his racial and political activities. The Third and Fifth Causes of Action were withdrawn.

The Sixth Cause of Action was a libel action. As a result of the inverted order of trial, defendant adduced evidence with respect to the defense of truth raised in the answer. It was not until well along in the trial that plaintiff's counsel decided to withdraw the Sixth Cause of Action. (183.) However, as a result of the withdrawal, the evidence submitted by defendant as to the libel action was not considered by this court since it was irrelevant to the remaining actions.

At the request of counsel for plaintiff, an unusual order of trial was followed by reason of the fact that plaintiff had not come on from Detroit and would not have been available until the second day of the trial. This unfortunate situation was not conducive to a logical approach

since under this arrangement defense witnesses were heard prior to those of plaintiff.

The basic issue in this case now remaining for decision is whether, under Title 49 U.S.C. § 1511, defendant TWA was authorized to refuse the transportation of plaintiff from London to Detroit. Plaintiff's counsel conceded that if defendant was authorized to refuse flight of plaintiff from London to Detroit there would be no cause of action for damages by reason of imprisonment in London. (272, 273.)[1] Consequently, the First Cause of Action as well as the Second Cause of Action depend upon the application of the above statute. Moreover, since there was no direct action on the part of defendant by which plaintiff suffered imprisonment in Pentonville Prison in London, no cause of action for the imprisonment could be maintained without proof of a causal relation between the refusal to fly plaintiff to Detroit and his incarceration in the London prison.

After hearing the testimony of the parties, examining the exhibits and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Jurisdiction exists by virtue of 28 U.S.C. § 1332 since there is a diversity of citizenship.

2. Plaintiff, Williams, was born and lived in Monroe, North Carolina until August 27, 1961. (101.) He is now 48 years old. He had three years of college level education and is presently a lecturer and author. (263, 289.)

3. On August 27, 1961 plaintiff left his home in Monroe, North Carolina. On August 28 he was indicted for alleged kidnapping in North Carolina. At that time plaintiff was in New York City and learned by radio that he had been indicted and that there was an FBI warrant out for his arrest. (101, 102, 108.)

4. Subsequent to plaintiff learning of the aforementioned indictment and warrant, on or about September 7 or 8, 1961 he fled the United States, living in Toronto, Canada for six weeks. In a roundabout journey by rail, ship and airplane Williams arrived in Havana, Cuba in November 1961. In 1965 plaintiff decided to return to the United States, but was unable to obtain a passport. (109.) He remained in Cuba until 1966. (102, 103, 104, 106.)

5. In September 1966 plaintiff left Cuba for Peking, China by airplane, via Moscow. He lived in Peking with his family for approximately two years. (106, 107.)

6. In 1968 plaintiff again decided to return to the United States to live and surrender to the FBI under the federal warrant. (118.) Subsequent to his decision to return to the United States, Williams traveled from Peking, China to Tanzania, Africa. While in Tanzania plaintiff attempted to procure a United States passport but was issued only a travel document. He returned to China. Plaintiff then returned to Tanzania in August 1969 with his two sons and wife, who were traveling with him. (110, 111, 112, 114.) Plaintiff's family flew to Detroit, Michigan in late August 1969 without plaintiff. (115.) Upon plaintiff's wife's arrival in Detroit, there was a large demonstration at the airport. (58.)

7. On or about September 4, 1969, in Dar es Salaam, Tanzania, plaintiff purchased a ticket from United Arab Airlines providing for air passage from Dar es Salaam, Tanzania to London, England via United Arab Airlines, and thereafter from London, England to Detroit, Michigan on TWA, defendant. The ticket was issued in the name of "R. Franklin." (116; Ex. 1.) Plaintiff arrived in London aboard a United Arab Airlines plane on September 5, 1968 between 4:00

---

1. Unless otherwise indicated, the numbers in parentheses refer to the stenographic minutes of the trial before this court on October 12, 15 and 16, 1974.

and 5:00 o'clock in the afternoon. (118, 119.)

8. At all times pertinent hereto, defendant TWA was a common carrier engaged in the business of transporting passengers for hire between various points, including London, England and Detroit, Michigan.

9. JOSEPH E. FLAHERTY was Security Representative for TWA. (47.) His responsibilities included conducting investigations such as stolen cargo, bad checks, credit cards, anti-hijack procedures, etc. Williams' name first came to his attention because of a telephone call on August 28, 1969 from Special Agent John Sullivan of the FBI in New York (48) who told him that Williams, a fugitive and for whom a warrant was outstanding, was arriving at the air field in Detroit on a TWA flight from London; that there was a *possibility of a demonstration when he arrived* and asked if it would be possible for TWA to have the aircraft parked elsewhere than at the passenger terminal or re-routed to land at a different station than Detroit. (49.)

Exhibit 2 (50) is a report from Flaherty's office at TWA Security at Kennedy Airport. In the absence of Flaherty's immediate superior, Steels, Flaherty contacted TWA's staff Vice President, Newman, and advised him of the request made by the FBI. (51.) Newman asked Flaherty to get additional information about Williams and he, Flaherty, obtained the information contained in Exhibit A (52), making copies for Newman in New York and sending the photos on an aircraft to London. (53.)

10. RICHARD E. NEWMAN was Staff Vice President of TWA in charge of Audit and Security in August and September 1969. (56.) On August 30, 1969 he received a call from Flaherty indicating that he, Flaherty, had received a call from Sullivan, FBI agent in New York, in reference to Williams, who was to be carried on a TWA flight from London to Detroit. Flaherty told Newman that the FBI was expecting a dem-

onstration in Detroit and that four weeks before, when Williams' wife came over, there had been a demonstration, at which time it appeared that there were some 300 people behind a barrier who eventually went through the barrier onto the field at Detroit. (57, 58.) Newman had a conversation with Wiser, President of TWA, about Williams and passed on the information from Flaherty. He also gave Wiser a copy of the bulletin. (60, 61.) There was also a discussion about Williams between TWA Vice President and Fletcher, General Counsel, at a meeting attended by Newman. Fletcher advised the Vice President and Newman that the airline could refuse Williams passage if Williams could or might be dangerous to the safety of the flight. (62.) Fletcher may well have been considering the general principle that conduct of the accused, as a fugitive from justice, indicates an inference of guilt as charged in the indictment dated August 28, 1961. According to Newman, the decision not to fly Williams on flight 791 was made on August 28, or 29. (64.) According to Newman, and I so find, there was no rule at that time with respect to searching passengers. (65.)

Some time before September 6, 1969, Newman called President Wiser's attention to a circular or poster which he had received from the FBI describing Williams and referring to certain facts. (12, 13, 14; see also Deft. Ex. A.) This poster bore a photograph of Williams and stated:

"CAUTION

"WILLIAMS ALLEGEDLY HAS POSSESSED A LARGE QUANTITY OF FIREARMS, INCLUDING A .45 CALIBER PISTOL WHICH HE CARRIES IN HIS CAR. HE HAS PREVIOUSLY BEEN DIAGNOSED AS SCHIZOPHRENIC AND HAS ADVOCATED AND THREATENED VIOLENCE. WILLIAMS SHOULD BE CONSIDERED ARMED AND EXTREMELY DANGEROUS."

11. Wiser knew that prior to August 1969 TWA had had four hijackings. Wiser was informed that the FBI had requested that if it flew Williams to the United States, TWA should be prepared to find a place to unload the airplane other than at the regular gate because of a possible demonstration and possible violence. (11, 12.) Prior to August 1969 Wiser had never heard of Williams. (22, 23.)

Wiser conceded that before September 6 he knew that Williams was said to be coming back to the United States to surrender on a fugitive warrant. (28, 29.) Wiser conceded that on September 6, prior to the decision not to carry Williams from London to Detroit, he knew that Williams might be taken into custody by the British authorities. (23, 24.)

Wiser decided that if Williams presented himself for passage at London the company would refuse to accept him for the following reasons, as stated by Wiser:

(1) Concern about what was read on the FBI circular (15);

(2) Concern expressed in Detroit about a demonstration on the arrival of the airplane which had originated from a conversation with the Detroit manager of TWA via Mr. Huntington and Mr. Newman (15);

(3) The warning on the circular about Williams being armed and dangerous (16);

(4) Wiser further stated that his concern was heightened by hijackings which the company was then experiencing, at the end of August and through the Labor Day Weekend, in which there was a different kind of hijacking than previously, particularly in that one of TWA's airplanes was blown up on the ground in Damascus and that sanctuary had been sought in a friendly country and some of the passengers held as hostages. (18, 19.)

(5) This decision by Wiser was made on Thursday September 4, 1969, after communication between New York and London offices of TWA. (24, 25, 26.)

While Williams was in London, Wiser offered to carry him back to Detroit if he was accompanied by a Mr. McCrae, a legal attache of the United States Embassy at London, but TWA did not get this word through to Williams in time. (35, 36, 38.) However, no consent was obtained from Williams to fly him from London to New York on the 5th. Contact was also made with Milton Henry, an attorney from Detroit. (40.)

12. JOHN H. STEELE, Corporate Director of Security for TWA in August and September 1969 received information about Williams from Flaherty and Newman on or about September 2. (69.) The flight which eventually carried Williams from London to Detroit was not a scheduled flight. (77.) Twenty policemen were at the arrival in Detroit. (78.)

13. Upon plaintiff's arrival in London on September 5, 1969 (118, 119) he went through Immigration and went to the United Arab Airlines booth to try to arrange travel to Detroit. Not finding anyone at the United Arab Airlines booth he went to the TWA office and spoke to a clerk about a flight to Detroit. (120, 121, 122.) Then, going back to get his baggage at the Immigration gate he was approached by the British Security Police (122) and asked to come to a nearby room for questioning and searching. He was told that it had been reported by the FBI that he was carrying arms and ammunition, although they found none when they searched him. Other British officials of the Criminal Investigation Department appeared, with further searches and questions. (123, 124, 125, 126.) Then the London Metropolitan Police appeared, having similar reports, and plaintiff underwent further searches. (126, 127.) Plaintiff was told that he was to be lodged in a prison known as Pentonville (129), where he remained for a number of days, making various attempts to leave. (130–144.) He was told that TWA had cancelled his flight and had refused to take him. (133.) Apparently, plaintiff was detained in

the London Pentonville Prison by the British authorities because he had neither a United States passport nor a British visa. He was told he was to leave by airplane for Cairo, Egypt, although he told the British authorities that he did not want to go there. (141.) However, this plane was found to be damaged. (142.) At the prison plaintiff refused to eat. (143.)

14. A few days after September 6, 1969, TWA attempted to effect arrangements with Williams to fly him to Detroit if he would place himself in custody. This Williams refused to do.

On or about September 11, 1969 TWA concluded arrangements with Williams' attorney, one Milton Henry, of Detroit, under which Williams, in company with Henry, returned to the United States on September 12, 1969 on a special flight operated by TWA from London to Detroit. Williams arrived in Detroit on the 12th at about 3:00 P.M. There he was seized by two FBI agents and there was no disorder at the airport. (145–152.) To the date of this trial Williams has not returned to North Carolina and is fighting an extradition proceeding in the Michigan courts. (100.)

## DISCUSSION

This is a case of first impression. This action was brought by an American citizen of the Negro Race who claims he was racially and politically discriminated against by a common carrier, TWA.[2]

Plaintiff, while under indictment for kidnapping in the State of North Carolina, and subsequently wanted by the FBI as a fugitive from justice, left the United States and traveled in different areas of the world. His travels, without a United States passport, included trips to Cuba, The People's Republic of China

and the Middle East. Upon plaintiff's decision to return to his native country, he attempted to procure a United States passport. Since he was under indictment, and a fugitive from justice, he was issued travel documents only. During plaintiff's sojourns through China and Cuba he published certain materials, lectured and gave several interviews.

■ The Second Circuit has recently made note of the fact that the "Political-Terrorist-Pirate" has changed his *modus operandi* from the highway and high seas to the air.[3]

"* * * We need no citation of authority or statistics to establish that domestic and international hijacking of airplanes poses a continuing hazard to public travel. Human life and property have been jeopardized by the mentally ill, the political terrorist and the criminal extortioner who have in recent years discovered that an airplane in flight, [and at the terminal] despite all of its engineering sophistication, is a uniquely fragile and vulnerable target when a passenger or crew member is threatened by a weapon or an explosive." United States v. Bell, 464 F.2d 667, 669 (2d Cir. 1972).

Congress' concern with the number of criminal acts committed on aircraft a decade prior to *Bell* can be noted from a portion of the 1961 House of Representative's Report with respect to legislation concerning hijackings and crimes aboard aircrafts:

"Recent events have demonstrated the urgent need for stronger Federal laws applicable to criminal acts committed aboard commercial and private aircraft.

"A series of acts of a criminal nature recently committed aboard aircraft

2. When TWA officials received the FBI wanted poster (Ex. A) they may well have noted the date of issuance of the federal warrant and thus have concluded that Williams was a fugitive from justice. The fact that Williams was seeking transportation from London to Michigan, rather than North Carolina, the state of indictment, indicates

that Williams was still attempting to avoid the trial in North Carolina.

3. I take judicial notice of the fact that there were approximately 41 hijacks of American planes occurring in the United States between September 6, 1968 and September 6, 1969.

has dramtically underscored the gaps in existing law which can operate to provide criminals with a haven from prosecution." H.R.Rep.No. 958, 87th Cong., 1st Sess., U.S.Code Congressional and Administrative News p. 2563 (1961).

Consequently in conjunction with the common carrier's responsibility to protect its passengers and to combat air piracy, Congress enacted special legislation which required Air Transportation Common Carriers to establish such tariffs as said common carriers judged necessary and reasonable under its particular method of operations to protect its passengers from hijacks and crimes committed aboard aircraft.

Such requirements are found in Title 49 U.S.C.A. § 1421(b), wherein it states in its relevant part:

"In prescribing standards, rules, and regulations, and in issuing certificates under this subchapter, the Administrator shall give *full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest* \* \* \*." (Emphasis added.)

In conjunction with this particular directive, Title 49 U.S.C.A. § 1511 provides:

"Subject to reasonable rules and regulations prescribed by the [Secretary of Transportation], any air carrier is authorized to refuse transportation to a passenger or to refuse to transport property when, in the opinion of the air carrier, such transportation would or might be inimical to safety of flight."

Accordingly, TWA filed with the Civil Aeronautics Board its Local and Joint International Passenger Rules Tariff No. R–3. Rule 8 of said Tariff provides in its pertinent part:

"(A) *Refusal, Cancellations or Removal*

"(1) Carrier will refuse to carry, cancel the reserved space of, or remove enroute any passenger when, in the exercise of its reasonable discretion carrier decides:

"(a) such action is necessary for reasons of safety;

"(b) such action is necessary to prevent violation of any applicable laws, regulations, or orders of any state or country to be flown from, into or over;

"(c) the conduct, status, age or mental or physical condition of the passenger is such as to

"(i) require special assistance of carrier; or

"(ii) cause him discomfort or make himself objectionable to other passengers; or

"(iii) involve any hazard or risk to himself or to other persons or to property; or

"(d) the passenger fails to observe the instructions of carrier."

Such Tariff restrictions, however, do and did not [4] permit specific kinds of discriminatory actions by the carrier, as provided in Title 49 U.S.C.A. § 1374, subdivision (b), wherein it states in its relevant part:

"No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, \* \* \* in air transportation in any respect whatsoever or subject any particular person, \* \* \* in air transportation to *any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever*." (Emphasis added.)

Case law under Section 1374(b) is sparse. Other than the decisions that hold that there is a private cause of action for a violation of Section 1374(b) and that the federal courts have jurisdiction to hear such actions, Fitzgerald v. Pan American World Airways, Inc.,

---

4. Section 1374 was amended in 1972. The section quoted above was in force at the time of the alleged incident.

229 F.2d 499 (2d Cir. 1956); see also Archibald v. Pan American World Airways, Inc., 460 F.2d 14 (9th Cir. 1972); Wills v. Trans World Airlines, Inc., 200 F.Supp. 360 (S.D.Cal.1961); Mortimer v. Delta Air Lines, 302 F.Supp. 276 (N.D.Ill.1969), there is little guidance as what "constitutes a prima facia case," Archibald v. Pan American World Airways, Inc., supra, 460 F.2d at 16, other than showing actual discrimination or preference. Flores v. Pan American World Airways, 259 F.Supp. 402 (D.P.R.1966).

Plaintiff's allegations, however, as enunciated in paragraphs 5 and 6 of his complaint allege unreasonable prejudice and unjust discrimination "because of his racial and political beliefs and activities." Virtually every case cited by plaintiff to support his allegations dealt with a passenger being refused passage or being "bumped" off a flight because of the oversale of reservations by the defendant-airlines.[5] Consequently, none of plaintiff's citations of authority with respect to his allegations in his complaint is persuasive.

In Wills v. Trans World Airlines, supra, the district court pointed out that neither the statute, Title 49 U.S.C.A. § 1374(b), nor any Congressional records give any guide lines with respect to the terms "undue or unreasonable preference" and "unjust discrimination" (200 F.Supp. at 363). However, analogous provisions in other Federal Acts involving discrimination have been interpreted to mean "discrimination in all its forms." Dixie Carriers v. United States, 351 U.S. 56, 60, 76 S.Ct. 578, 100 L.Ed. 934 (1956). The court in *Wills* continued, stating, "what is here condemned is any *unwarranted* interference with a passenger's right to accommodations aboard a particular flight, * * *." Wills v. Trans World Airlines, Inc., 200 F.Supp. at 365 (emphasis added).

In a like manner, an analogy may be drawn between the particular allegation made by the plaintiff with respect to the racial and political discrimination and Title 42 U.S.C.A. §§ 1981–1983 and the requisite proof necessary thereunder.

In Schetter v. Heim, 300 F.Supp. 1070, 1073 (E.D.Wis.1969) the court noted:

"The clear purpose of these sections [1981–1983] is to provide for equality between persons of different races. In order for a plaintiff to predicate an action on either of these sections, he must have been deprived of a right which, under similar circumstances, would have been accorded to a person of a different race."

See also Abshire v. Chicago and Eastern Illinois Railroad Co., 352 F.Supp. 601 (N.D.Ill.1972).

In addition, of particular note is the holding in both *Abshire* and *Schetter* that those sections of Title 42 U.S.C.A. do not apply to discrimination based on national origin or religion.

■ Plaintiff has failed to establish by a fair preponderance of the credible evidence that he was deprived of a right which would have been accorded a person of a different race.

Additionally, a not unreasonable interpretation of deprivation of an individual's rights similarly would apply to

5. This does not mean that an individual would not have a private cause of action for racial discrimination under this section. United States v. City of Montgomery, 201 F.Supp. 590 (M.D.Ala.1962). However, such was apparently not in issue in *Fitzgerald*, where the plaintiff was a Negro. The Second Circuit, per Judge Frank, stated: "Although we regard it as not controlling, we note also the following: Congress sought uniformity in the practices of those subject to this Act. It is by no means clear that, in all states and territories, the common-law rules would render unlawful racial differentiations in accord with the 'separate but equal doctrine,' whereas, in the light of recent Supreme Court decisions, we must construe Section 484(b) so that that doctrine will not apply." Fitzgerald v. Pan American World Airways, Inc., 229 F.2d 499, 502 (2d Cir. 1956) (footnotes omitted). Consequently, *Fitzgerald* is of little guidance in the instant action.

plaintiff's claim with respect to his political beliefs.

■■ It has long been the common law of this country that a common carrier has the responsibility to protect its passengers from danger and inconvenience. This includes the right of a common carrier to reasonably refuse passage or remove a passenger who is either in danger of injuring himself or other passengers or creating a dangerous condition. Meyer v. St. Louis I. M. & S. Ry., 54 F. 116 (8th Cir. 1893); Pearson v. Duane, 71 U.S. (4 Wall) 605, 18 L.Ed. 447 (1866).

In Meyer, supra, the court specifically concluded that a common carrier is not obligated to receive. as a passenger an insane or drunken person, or one whose physical or mental condition is such that his presence upon the vehicle of the carrier may cause injury or substantial discomfort to the other passengers.

"The law imposes upon a common carrier the duty of exercising a very high degree of care and foresight for the safe transportation of the passengers who intrust themselves to him for that purpose; and in the performance of this duty, which the carrier cannot evade or escape from, the carrier certainly has the right to exclude from his vehicle any one whose condition is such that a *possibility* of danger may be thrown upon the other passengers if he is admitted as a passenger." (At p. 120 of 54 F.) (Emphasis added.)

Moreover, the court went on, noting:

" \* \* \* It would cast an unjust burden on the carrier to hold, on the one hand, that he must exercise the highest degree of care and caution for the protection of his passengers, and, on the other hand, to hold that he has not the right to exclude from his vehicle one whose condition is such that he may cause danger to the other passengers, simply because, *at the moment he offers himself as a passenger, he is quiet, well-behaved, or apparently harmless.*" (At p. 120.) (Emphasis added.)

■ In addition to the requirement that the common carrier provide safe passage for its passengers, the State of Michigan also requires that a common carrier provide its passengers a safe terminal for both board and exiting the carrier. Sink v. Grand Trunk Western Ry., 227 Mich. 21, 198 N.W. 238 (1924). See also Ketchum v. Denver & Rio Grande Western R. Co., 175 F.2d 69 (10th Cir. 1949). This is significant in light of the request by the FBI to have TWA use an alternate point of disembarkation because of a possible demonstration when plaintiff landed. However, TWA was unable to change its disembarkation point at the Detroit airport.

■ Williams argues that once TWA received the FBI "wanted" poster on him, TWA had a duty to investigate his background to determine the accuracy of and the information on the "wanted" poster and, consequently, by not investigating his background, TWA acted unreasonably. (184, 281, 282.)

"Mr. Wulf: 'Now, in pursuit of my theory of the case that they had a duty. If they were going to exercise their responsibility to refuse to carry Mr. Williams reasonably, that it was not enough for them to rely on that FBI bulletin.'

"The Court: 'Are you then contending that the airline may not decide this rejection matter at the place and time and without extended investigation? Are you contending that they should intensively investigate the past history of these persons and not rely, for example upon statements of the FBI which may have been, to some extent, supported by admissions here?'

"Mr. Wulf: 'Yes, your honor.'" (281, 282.)

In a case uniquely similar to plaintiff's theory in the instant action, the Third Circuit, in direct opposition to

what plaintiff asserts was TWA's duty, pointed out that a common carrier's "employees * * * are not required, as the plaintiffs apparently assert, to constitute themselves a court of law in order to determine whether extradition proceedings were validly conducted before accepting as a passenger for transportation a person subject to extradition held upon a warrant valid on its face." Picking et al. v. Pennsylvania R. Co., 151 F.2d 240, 253 (3rd Cir. 1945), reversed and remanded on other grounds.

The plaintiffs in *Picking* had been convicted in New York for a misdemeanor and were placed on parole. One of the plaintiffs had her parole revoked and a bench warrant was issued for her arrest. That plaintiff was subsequently found to be in Pennsylvania, and after extradition proceedings was extradited to New York. Subsequently, the plaintiffs brought their action, claiming that the railroad was in a conspiracy to violate their constitutional rights under the Fourteenth Amendment and a conspiracy to subject them to false arrest and false imprisonment.

In addition, the court in *Picking* pointed out the duty of a common carrier to transport as passengers persons in custody of peace officers under a warrant valid on its face. (At 253.) (See Finding of Fact 11.) In a more recent case, Smith v. Ellington, 348 F.2d 1021 (6th Cir. 1965), the court noted that there is "no rule of law as contended for by the plaintiff, which requires the Governor in extradition proceedings or the Sheriff in holding in custody one legally delivered to him for that purpose to make a determination of the guilt or innocence of the accused." (At 1023.)

■ Admittedly, TWA is not a governmental authority; however, TWA never had plaintiff in custody, nor did TWA in any way restrict or confine plaintiff. Such was done by British authorities due to the failure of plaintiff to have proper immigration papers. For TWA not to have heeded the FBI's warning about Williams would have been imprudent. To hold that such a non-governmental instrumentality as a common carrier must review those legal processes, which is not required of a more appropriate agency such as a sheriff or governor, would be to place an unreasonable burden upon it.

## FALSE IMPRISONMENT

Plaintiff's counsel has conceded that if TWA was authorized, and did not act unreasonably in refusing passage to plaintiff, then TWA would not be liable for the subsequent imprisonment of plaintiff by the London authorities. (272, 273.) However, because of the integrated nature of the claims of false imprisonment and unreasonableness of defendant's action, a short discussion with respect to the claim of false imprisonment is appropriate.

Initially, we must note the juxtaposition of the sequence of events which led up to the confinement of plaintiff. In the instant action, the investigation was initiated by the FBI, which subsequently notified TWA of plaintiff and his background. In the typical false imprisonment controversy, an individual informs the authorities, who subsequently take plaintiff into custody. The validity of the defense for an action for false imprisonment of probable cause, factually supported, is well accepted. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L. Ed.2d 288 (1967); Lieberman v. Gulf Oil Corporation, 331 F.2d 160 (2d Cir. 1964).

The Second Circuit in Lieberman, supra, succinctly stated the factors to be proved for recovery by a plaintiff against a corporation for false imprisonment by governmental authorities:

"In order to recover * * * it [is] necessary for plaintiff to show that defendant's agents made false statements about plaintiff which ei-

ther were known to be false or were made with reckless indifference to their truth or falsity, and that these statements led to plaintiff's arrest." (P. 162.)

See also Odorizzi v. A. O. Smith Corp., 452 F.2d 229 (7th Cir. 1971).

In addition, the courts have held valid the defense of good faith and probable cause in actions against non-government officials ·who acted at the request of government authorities to confine an individual. Papagianakis et al. v. The Samos et al., 186 F.2d 257 (4th Cir. 1950); The Edit H. Sagi et al. v. Harkkila et al., 119 F.2d 4 (4th Cir. 1941).

I find that there was no prejudice or unjust discrimination exercised by defendant TWA against plaintiff because of his race or political beliefs or activities. Specifically, I find that there was no proof whatsoever that plaintiff was treated differently than any other individual by defendant, under the circumstances, in defendant's refusal to accept plaintiff as a passenger from London to Detroit on September 6, 1969.

### CONCLUSIONS OF LAW

1. Defendant TWA under the circumstances of this case heretofore stated in the Findings of Fact was authorized to refuse transportation to plaintiff under Title 49 U.S.C. § 1511.

2. Defendant TWA's refusal to transport plaintiff under the circumstances of this case was not arbitrary, unreasonable or motivated by racial or political prejudice.

3. Since the refusal of TWA to accept plaintiff for flight from London to Detroit was authorized, the cause of action based upon contract must be dismissed and the cause of action for damages by reason of imprisonment must likewise be dismissed.

4. Consequently, defendant is entitled to judgment dismissing the complaint together with costs of this action.

Settle judgment promptly upon notice.