# DIXIE CARRIERS, INC., ET AL. v. UNITED STATES
## ET AL.

No. 233.   Argued March 27, 1956.—Decided April 23, 1956.

*Nuel D. Belnap* argued the cause for appellants.   With him on the brief were *Donald Macleay* and *Francis W. McInerny.*

*Daniel M. Friedman* argued the cause for the United States, appellee.   With him on the brief were *Solicitor General Soberloff* and *Assistant Attorney General Barnes.*

*Samuel R. Howell* argued the cause for the Interstate Commerce Commission, appellee.   With him on the brief was *Robert W. Ginnane.*

*John A. Daily* argued the cause for the New York Central Railroad Co. et al., appellees.   With him on the brief was *Robert D. Brooks.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Sulphur mined near Galveston, Texas, can be shipped to Danville, Illinois, either by rail or by barge and

rail. If the sulphur goes by barge and rail, it is transported up the Mississippi via New Orleans to East St. Louis and then by rail to Danville. The total charge for that movement is $9.77 per ton.[1] The total of the various local rates for all-rail shipments from the mines to Danville is $11.68. But the railroads have established a joint all-rail rate [2] of $9.184 which is lower than both the combination all-rail rate and the combination rail-barge rate.

Appellants, who are water carriers, requested the competing railroads to establish a joint rail-barge rate of $7.67 on sulphur from Galveston to Danville. The railroads refused. Appellants thereupon filed a complaint with the Interstate Commerce Commission, alleging that the existing rail-barge rates on sulphur were excessive and unreasonable, that through rail-barge routes and joint rates with reasonable differentials below the all-rail rates should be established, and that the refusal of the railroads to establish such joint rates discriminated against the barges as connecting carriers in violation of the Interstate Commerce Act, as amended by the Transportation Act of 1940.[3] Appellants requested the Commission to establish a through rail-barge route and a joint rate and suggested that the joint rate be fixed at $7.67. Appellants proposed that the Danville railroads receive $2.26 as a division of that rate, calculated to be the same as they receive from the all-rail rate from Galveston to Danville. Under the proposed rate, the cost of rail-barge

---

[1] The charge consists of rail and loading charges of $1.50 at Galveston, the barge rate of $5.32 to East St. Louis, and the local rail rate of $2.95 from East St. Louis to Danville.

[2] For a discussion of joint rates see *St. Louis S. W. R. Co.* v. *United States*, 245 U. S. 136, 139, note 2; *United States* v. *Great Northern R. Co.*, 343 U. S. 562.

[3] 24 Stat. 379, as amended, 54 Stat. 898, 49 U. S. C. § 1.

shipments from the mines to Danville would be $9.17 as compared with the all-rail rate of $9.184.

A Division of the Commission dismissed the complaint, one Commissioner dissenting. 287 I. C. C. 403. The Commission affirmed the Division, three Commissioners dissenting. 291 I. C. C. 422. A three-judge District Court sustained the Commission. 129 F. Supp. 28. The case is here on appeal, 28 U. S. C. §§ 1253, 2101 (b), 2325.

Section 3 (4) of the Act provides that "All carriers subject to the provisions of this part . . . shall not discriminate in their rates, fares, and charges between connecting lines . . . ." Section 3 (4) defines "connecting line" as including "any common carrier by water subject to Part III." Appellants are common carriers by water within that definition. They maintain that it is unlawful under § 3 (4) of the Act for a railroad to refuse to join in through routes and joint rates with a water carrier when it has already joined in such routes and rates with a connecting rail line. They further maintain that the power of the Commission under § 307 (d)[4] to establish

---

[4] Section 307 (d) provides:

"The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without a complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property by common carriers by water, or by such carriers and carriers by railroad, or the maxima or minima, or maxima and minima, to be charged, and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated. In the case of a through route, where one of the carriers is a common carrier by water, the Commission shall prescribe such reasonable differentials as it may find to be justified between all-rail rates and the joint rates in connection with such common carrier by water. . . ."

through routes and joint rates should have been exercised here.

We had a closely related question before us in *Interstate Commerce Commission* v. *Mechling,* 330 U. S. 567. In that case we invalidated an order of the Commission which approved higher rail rates for the transportation of grain east of Chicago if it had arrived in Chicago by barge, rather than by rail. We reviewed the history of the Transportation Act of 1940 and concluded that that Act "unequivocally required the Commission to fix rates which would preserve for shippers the inherent advantages of barge transportation: lower cost of equipment, operation, and therefore service." *Id.,* at 575. We held that the discrimination which was outlawed applied to through rates as well as to ordinary rates.

The *Mechling* case involved an attempt to deprive water transportation of one of its "inherent advantages," as that phrase is used in the preamble of the 1940 Act, by increasing the cost of barge service. The Commission's present decision achieves the same result through the device of a joint rate allowed carriers by rail but denied carriers by water. It was recognized in the debates on the bill that became the Transportation Act of 1940 that manipulation of rail rates downward might deprive water carriers of their "inherent advantages" and therefore violate the Act.[5] It was emphasized that one of the evils to be remedied was cutthroat competition, whereby strong rail carriers would reduce their rates, put-

---

[5] There was the following colloquy during the debate in the Senate between Senator Wheeler who was in charge of the bill and Senator Norris (84 Cong. Rec. 5874):

"Mr. NORRIS. Suppose, however, this bill should become a law, and an article of freight were to be transported which admittedly could be carried by water better than by railroad, and suppose the railroad should undertake to reduce its rate down to the water rate:

ting water carriers out of business.[6] There was recognition that for shippers to get the benefit of the "inherent advantages" of water transportation there frequently would have to be joint rail-barge rates.[7] Barge transportation frequently covers only one segment of the journey to market. The failure of the railroads to establish non-discriminatory joint rates with barges might, therefore, seriously impair the development of barge service as a vital component of our national transportation system. Section 3 outlaws discrimination in all its forms. See *New York* v. *United States,* 331 U. S. 284, 296. Where there is discrimination by the use of a joint rate to favor rail carriers over carriers by water and to deprive the latter of their "inherent advantages," the Commission has a duty to end it under § 307 (d). That subsection [8] makes it mandatory for the Commission to establish through routes and joint rates "whenever deemed by it to be necessary or desirable in the public interest." The public interest, as defined in the Act, is the guide to the Commission's action. *McLean Trucking Co.* v. *United*

Would there be anything in the law to prevent the railroad from doing that?

"Mr. WHEELER. Of course there would be.

"Mr. NORRIS. Disastrous rates can be brought about by reducing them just as well as by increasing them, as a matter of fact.

"Mr. WHEELER. Exactly.

"Mr. NORRIS. And the water carrier ought to be protected on the freight that ought to be carried by water rather than on the railroad.

"Mr. WHEELER. It would be absolutely protected under this measure.

"Mr. NORRIS. That is what I want to see done.

"Mr. WHEELER. There is not any question about it. Under the rate-making provision and under the other provisions I have read, there is not any question about it."

[6] *Id.,* 5877.

[7] *Id.,* 5875.

[8] Note 4, *supra.*

*States,* 321 U. S. 67, 82. The policy is to preserve all the "inherent advantages" of the water carriers.[9] That means that a joint barge-rail rate must be established when it appears, as here, that a joint rail rate discriminates against the water carriers. Otherwise a manipulated rate structure will take the business from the water carriers. In absence of the joint all-rail rate, the rail-barge combination rate for sulphur would be $1.91 per ton less than the all-rail combination rate between the same points. That differential reflects the lower cost of the barge segment of the journey. It is at once lost to shippers when joint rates are allowed rail carriers and withheld from the water carriers. To hold otherwise would be to sanction a rate structure which, through the use of discriminatory joint rates, denies shippers the "inherent advantages" of water transportation.

*Reversed.*

---

[9] The Division of the Commission thought that regard for the "inherent advantages" of water transportation did not require it "to force rail carriers, where they maintain a depressed rate to meet water competition, to further depress their earnings on the traffic in order to favor that same form of competition." 287 I. C. C., at 407. But part of that critical "depressed rate"—and the one most relevant here—is the $2.26 of the joint all-rail rate received by the East St. Louis-Danville rail carrier. For this same haul, the East St. Louis-Danville rail carrier receives $2.95 on the barge-rail rate. Yet on that haul the railroad has no competition from the water carriers.