**LOUISVILLE AND NASHVILLE RAILROAD COMPANY and the Pennsylvania Railroad Company, Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 5227.**

United States District Court
W. D. Kentucky,
Louisville Division.

May 15, 1967.

---

4. Govt. Ex. 3; described in Count Three.

5. Govt. Ex. 5; described in Count Five.

Carl Helmetag, Jr., Philadelphia, Pa. (Joseph E. Stopher, R. Lee Blackwell, Elbert R. Leigh, Louisville, Ky., James A. Bistline, Harry J. Breithaupt, Jr., Stanfield Johnson and Gregory S. Prince, Washington, D. C., J. Edgar McDonald, New York City, Thormund A. Miller, San Francisco, Cal., and Donal L. Turkal, Richmond, Va., on the brief), for plaintiffs and intervening railroads supporting plaintiffs.

Robert K. Johnson, Atty., Dept. of Justice, Washington, D. C. (Ernest W. Rivers, U. S. Atty., Western District of Kentucky, Louisville, Ky., Donald F. Turner, Asst. Atty. Gen. of United States, and Lionel Kestenbaum, Atty., Dept. of Justice, Washington, D. C., on the brief), for United States of America, nominally a defendant, but in support of plaintiffs.

Leonard S. Goodman, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C. (Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., on the brief), for defendant, Interstate Commerce Commission.

Harry C. Ames, Jr., J. Raymond Clark, Robert L. Wright and Bryce Rea, Jr., Washington, D. C. (Robert E. Webb, S. Russell Smith, Eli H. Brown, III, and Boyce F. Martin, Jr., Louisville, Ky., George M. Catlett, Frankfort, Ky., Harry C. Ames, A. Alvis Layne, Peter T. Beardsley, Harry J. Jordan, Thomas M. Knebel and Samuel H. Moerman, Washington, D. C., T. Randolph Buck, Houston, Tex., and Nuel D. Belnap and Richard M. Freeman, Chicago, Ill., on the brief), for interveners supporting defendant, Interstate Commerce Commission.

Before PHILLIPS, Circuit Judge, and BROOKS and GORDON, District Judges.

## OPINION

JAMES F. GORDON, District Judge.

This suit was brought before this Three-Judge Court, under the provisions of 28 U.S.C. §§ 1336, 2284, 2321–2325, by the Louisville and Nashville Railroad Company and The Pennsylvania Railroad Company to enjoin, annul and set aside an order of the Interstate Commerce Commission in Investigation and Suspension Docket No. 8038, Ingot Molds, Pa. to Steelton, Ky., 326 I.C.C. 77 (1965). As required by law, the United States of America was named a defendant, as was the Interstate Commerce Commission.

Some 48 railroads were permitted to intervene as additional plaintiffs in support of the principal plaintiff railroads. Interested and requesting barge lines, truck carriers and related associations were permitted to intervene in support of the defendant, Interstate Commerce Commission.

The United States of America, admitting that "the Order of the Interstate Commerce Commission is invalid", was, for purposes of brief and oral argument, treated as an additional plaintiff.

On January 23, 1967, oral argument was heard before this Court.

In 1953, the Green River Steel Corporation began purchasing ingot molds and stools from the Shenango Penn Mold Company at Neville Island, Pittsburgh, Pa. The shipper's plant at Neville Island is served by the Pennsylvania Railroad in connection with a short-line railroad, and the receiver's plant at Steelton, Kentucky is served directly by the Louisville and Nashville Railroad. Prior to 1965 the barge-truck route received substantially all of this traffic because its charges were below rail charges. The then and present charge for movement by barge-truck being $5.11 per gross ton, minimum 600 gross tons, and the

railroad charge then being $11.86 per ton, subject to a carload minimum of 100,000 pounds.

With the stated purpose of enabling them to compete for this traffic, the respondent railroads published, effective December 1, 1963, a reduced rate on ingot molds, from Neville Island and Pittsburgh, Pa. to Steelton, Ky., of $5.11 per ton, when moved in single shipments of not less than 600 gross tons, minimum weight 112,000 pounds per car (12 or fewer cars) on one bill of lading, from one consignor at one origin to one consignee at one destination, with delivery to the originating railroad to be completed on one day. Consignee testimony indicates that if the railroads are to participate substantially in the movement, it will be necessary to have a rail rate not exceeding the total cost to the consignee of handling the ingot molds via barge-motor service.

The Commission found that the railroads' so-called out-of-pocket costs of transporting the ingot molds traffic, when computed by its own Rail Form A formula, would be $4.689 per ton, and substantially less if return on investment was eliminated. Since the reduced rail rate exceeded such costs by 42.1 cents, the Commission found that the rate would be compensatory. The Commission further found that the lower rail rate of $5.11, by attracting greater volume, would produce greater revenues in excess of out-of-pocket costs than would the higher rail rate of $11.86, which formerly had attracted only minimal tonnage, and also that "the railroad out-of-pocket costs are lower than the barge-motor lines' variable (i. e., out-of-pocket) costs". Further, that the railroads' "fully-distributed" costs amounted to $7.594 and the barge-truck "fully-distributed" costs were $5.196. These "fully-distributed" cost calculations were made by adding to the expenses incurred in handling the ingot molds traffic statistical apportionments of the respective modes' constant costs. The constant costs are expenses which are not related or traceable to the handling of any particular item of traffic.

Upon protest of the barge lines, the reduced rail rate was suspended and placed under investigation by the Commission. By voluntary agreement, the suspension period was extended until the matter was determined by Division 2. After Division 2, on February 17, 1965, 323 I.C.C. 758, found the rate to be lawful, the railroads made it effective on March 19, 1965. This rate has remained in effect since that time. Subsequently, December 2, 1965, the entire Commission in its report and order found the rate to be unlawful and ordered it cancelled, 326 I.C.C. 77, but this order of the Commission has been stayed pending consideration of the situation by this Court.

The Commission held that the determination of which mode had the inherent advantage of lower costs in handling the involved ingot molds traffic should be based upon a comparison of the "fully-distributed" costs of the two modes. Upon this comparison, it found that the barge-truck route possessed the advantage of lower costs in transporting ingot molds. It further decided that the reduced rail rate unlawfully "impinged upon the ability of the barge-truck mode competitively to assert its inherent cost advantage" because the reduced rate was below the level of the "fully-distributed" costs of the barge-truck route. The Commission established the "fully-distributed" costs of the barge-truck route ($5.196) as the floor for the reduced rail rate, although the barge-truck rate of $5.11 was below this level.

The principal statutory provision governing this controversy is Section 15a(3) of the Interstate Commerce Act (49 U.S.C. § 15a(3)), which came into the Act by the enactment of the Transportation Act of 1958, 72 Stat. 572. That Section reads:

In a proceeding involving competition between carriers of different modes of transportation subject to this Act, the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the

facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy declared in this Act.

The National Transportation Policy referred to is the preamble to the Interstate Commerce Act and provides guidance for interpreting the various sections of the Act. In its present form, it became part of the Interstate Commerce Act by the enactment of the Transportation Act of 1940, 54 Stat. 898. It reads:

It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.

Jurisdiction of the subject matter and venue of this action in this Court is conceded by the parties.

Under Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 1009, the scope of our review of the Commission's order is limited to a determination of whether the order is arbitrary or not in accordance with the law, and whether the Commission's findings are supported by substantial evidence. An order is arbitrary within the meaning of the Administrative Procedure Act if it lacks a stated rational basis. See Gilbertsville Trucking Co. v. United States, 371 U.S. 115, 126, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962); Burlington Truck Lines v. United States, 371 U.S. 156, 167–168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Eastern Central Motor Carriers Ass'n v. United States, 239 F.Supp. 591, 594 (D.D.C.1965). It is not in accordance with the law within the meaning of Section 10(e) if it is based upon an erroneous interpretation or misapplication of relevant statutory provisions. See St. Louis-San Francisco Ry. Co. v. United States, 207 F.Supp. 293, 295 (E.D.Mo. 1962); Missouri Pacific R. R. Co. v. United States, 203 F.Supp. 629, 631–633 (E.D.Mo.1962). While the determinations of an administrative agency are normally entitled to considerable deference upon review, cf. East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 54, 76 S.Ct. 574, 100 L.Ed. 917 (1956), and orders of the Commission which satisfy the requirements stated above are not to be disturbed on review even though the Court might reach a different result on the record, "it is not the function of a court sitting in such review merely to apply a rubber stamp of approval regardless of whether or not criteria for affirmance are established by the record". Cincinnati, N. O. & T. P. Ry. Co. v. United States, 229 F.Supp. 572, 575 (S.D.Ohio 1964), vacated sub. nom. Arrow Transp. Co. v. Cincinnati, N. O. & T. P. Ry. Co., 379 U.S. 642, 85 S.Ct. 610, 13 L.Ed.2d 550 (1965).

We have concluded that the Commission's order must be set aside, *first*, because it lacks a rational basis and thus is arbitrary and, *second*, because it is in-

consistent with the objectives and purposes of Congress in enacting Section 15a(3) of the Interstate Commerce Act, 49 U.S.C. § 15a(3), and thus is not in accordance with law.

In disapproving the proposed reduced rate of the railroads, the Commission appears to us to be plainly holding up the railroad rate "to protect the traffic" of another mode. It argues, however, that the National Transportation Policy, to which it is commanded to give "due consideration" by the same provision, compels this result. It relies specifically on the requirement that the Act be administered to "recognize and preserve the inherent advantages of each (mode of transportation)".

In Interstate Commerce Comm'n v. New York, N. H. & H. R. R. Co., 372 U.S. 744, 760–761, 83 S.Ct. 1038, 10 L. Ed.2d 108 (1963) (referred to hereafter as *New Haven*), the Supreme Court specifically left open the question which is raised in this proceeding. The Court said:

It is not for us to make this determination at this stage, or to decide in advance precisely how either carrier's inherent advantages should be measured or protected. It may be, for example, that neither a comparison of 'out-of-pocket' nor a comparison of 'fully distributed' costs, as those terms are defined by the Commission, is the appropriate method of deciding which of two competing modes has the cost advantage on a given movement. * * * These and other similar questions should be left for initial resolution to the Commission's informed judgment. (372 U.S. at 760–761, 83 S.Ct. at 1048)

This is the first case following *New Haven* in which a court has been called upon to review a determination by the Commission of how the inherent advantages of competing modes of transportation should be recognized or preserved. Since there are no directly controlling court precedents, it is for this court to determine whether the Commission's order properly implements the objectives and purposes of the Congress in enacting Section 15a(3).

We hold, first, that the Commission has failed to state a rational basis to support its conclusion that the "fully-distributed" costs of the two competing modes must be compared to determine which mode has an inherent cost advantage. In support of this conclusion, the Commission states:

We do not agree with respondents' arguments that fully distributed costs are an inappropriate or inadequate measure of the inherent cost advantages of competing regulated carriers. That is not to say that fully distributed costs should set the floor for transportation prices. In the setting of particular rates, as where competition from unregulated carriers compels, a carrier should be allowed to set its rates below fully distributed costs. However, merely because a carrier is able, without incurring an out-of-pocket loss, to handle certain traffic at rates below fully distributed costs, and perhaps by diverting sufficient tonnage from its regulated competitors to maximize thereby the contribution that such traffic would make to its overhead, *does not necessarily mean that the carrier is the more efficient of the two.* Carriers, such as the railroad respondents, do not, in the circumstances here present, possess an inherent cost advantage within the context of the national transportation policy which the Commission is obligated to recognize and preserve. (326 I.C.C. at 82) (Emphasis added.)

The language we have just quoted contains the only statement in the Commission's opinion in which it refers to the question of the relative efficiency of the competing carriers in carrying this traffic. This question is one of great importance in view of the Commission's obligation, declared in the National Transportation Policy and the ratemaking provisions of the Act, to promote efficient and economical use of transportation resources and the establishment of

rates which are as low as possible. The importance of these considerations has been underscored repeatedly by the courts. Thus, the Supreme Court in *New Haven* emphasized the Congressional policy to promote "hard competition" (372 U.S. at 759, 83 S.Ct. 1038.). In St. Louis-San Francisco Ry. Co. v. United States, 207 F.Supp. 293, 298–299 (E.D.Mo.1962), the court emphasized the obligation of the Commission to consider "the need, in the public interest of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service".

The Commission states that: "Merely because a carrier is able, without incurring an out-of-pocket loss, to handle certain traffic at rates below fully-distributed costs and by gaining added traffic maximize the contribution which such traffic makes to its overhead, does not necessarily mean that the carrier is the more efficient of the two" (326 I.C.C. at 82). Are we not entitled to ask *in what circumstances*, if any, would the carrier with lower out-of-pocket costs be *less efficient?* Are we not entitled to some explanation *why the standard* chosen by the Commission *measures* which carrier is more efficient in providing the service here involved? On the basis of the Commission's report, we are left completely in the dark on these matters.

The Commission's failure to explain how its approach for recognizing and preserving the inherent advantages of the different modes of transportation promotes the most efficient and economical use of transportation resources is particularly wanting since the record before it contained testimony addressed to this question; though the Commission was not bound to accept same, such did at least, we think, make it necessary for the Commission to set forth adequate reasons to support its own approach. Such reasons are lacking in the Commission's report.

For example, the record indicates that one of the constant expenses which is included in the railroads' "fully-distrib-

uted" costs is an allocated share of the deficits (very substantial in amount) incurred by the railroads in providing passenger and less-than-carload services.

The barge lines and motor freight carriers do not provide passenger services. Is it unrealistic in comparing the relative efficiency of the two modes, to include as a part of the railroads' costs these deficits? Is it equally unrealistic in determining which mode is more efficient, to include any other constant expenses in the costs being compared, since these expenses, like the passenger deficits, are not related to furnishing the particular service? The Commission nowhere comes to grips with these questions, nor does it set forth its own analysis in making its determination.

In its statement supporting its conclusion hereinabove, the Commission also says that, "In the setting of particular rates, as where competition from unregulated carriers compels, a carrier should be allowed to set its rates below fully distributed costs." This statement reflects the Commission's use of an out-of-pocket cost comparison to determine which of the competing modes has an inherent advantage in situations where there is substantial competition from unregulated carriers. In such situations, the Commission finds a reduction lawful if it exceeds the proponent carrier's out-of-pocket costs. See Grain in Multiple-Car Shipments—River Crossings to the South, 321 I.C.C. 582 (1963).

The Commission leaves unexplained its use of different pricing floors *depending upon whether a reduced rate* is intended to meet *regulated* or *unregulated* competition.

We believe that the reasons given by the Commission in the Southern Grain case to support its conclusion that the public interest is fostered by permitting a regulated mode to compete with non-regulated lawful carriers, by offering reduced rates which exceed out-of-pocket costs, logically would seem to apply equally where competition is between two competing regulated modes.

Likewise, we reject as adequate support for the Commission's decision here, its finding that since railroad out-of-pocket costs are lower than barge-motor line variable costs, the former could wage a longer rate battle than the latter, with the Commission powerless to intercede and halt such devastation, all to the prejudice of recognition and preservation of inherent advantage as contemplated by national policy. The Commission's power to disapprove non-compensatory rates and prevent destructive competition is firmly established. Such an argument that the consequence of a rate reduction below fully distributed costs would leave the Commission powerless has heretofore been rejected. Missouri Pacific R. R. Co. v. United States, 203 F.Supp. 629, 635 (E.D.Mo.1962).

Citations by the Commission of several prior decisions in which it compared "fully-distributed" costs to determine which mode had an inherent advantage contain no further explanation to support such a standard, although not determinative, we note that the Commission has not consistently employed a "fully-distributed" cost standard. For example, in one recent case, Roasted Coffee and Coffee Extracts From Texas Gulf Ports to Texas, 314 I.C.C. 675, 680 (1961), the Commission says, "It would be inconsistent with the national transportation policy to prohibit the respondents from establishing competitively necessary rates which are shown to be compensatory." And see Paint and Related Articles in Official Territory, 308 I.C.C. 439 (1959); Fresh Meats, Transcontinental, Westbound, 309 I.C.C. 529, 544 (1960); Prue Motor Transp. Inc. v. Boston & Maine R. R., 316 I.C.C. 299, 302 (1962). Cf. Iron Ore, Cleveland, Ohio to Ohio and Pennsylvania, 323 I.C.C. 746, 754 (1965), complaint dismissed, Baltimore & Ohio R. R. Co. v. United States, 249 F.Supp. 712 (W.D.Pa.1965), aff'd per curiam 385 U.S. 3, 87 S.Ct. 32, 17 L.Ed.2d 2 (1966).

The Commission also relies upon the decision of the Supreme Court in New Haven. We have previously pointed out that the Supreme Court there specifically left open for later decision the question which is presented in this proceeding, after making it clear that this question was not before it (372 U.S. at 749–750, 83 S.Ct. 1038). As we read the Supreme Court's opinion, it held that the Commission cannot, under Section 15a (3) and the National Transportation Policy, find unlawful the reduced rate of one mode merely because it would divert some or even all of the traffic from a competing mode. As the Court said:

If there is one fact that stands out in bold relief in the legislative history of § 15a(3), it is that Congress did not regard the setting of a rate at a particular level as constituting an unfair or destructive competitive practice simply because that rate would divert some or all of the traffic from a competing mode. (372 U.S. at 759, 83 S. Ct. at 1047).

The Court also said that a reduced compensatory rate should not be found unlawful unless this is necessary to preserve the inherent advantages of a competing mode (372 U.S. at 758, 83 S.Ct. 1038). And it added:

If a carrier is prohibited from establishing a reduced rate that is not detrimental to its own revenue requirements merely because the rate will divert traffic from others, then the carrier is thwarted from asserting its own inherent advantages of cost and service. (372 U.S. at 759, 83 S.Ct. at 1048)

We note that in the situation before us the Commission found not only that the reduced rail rate would be compensatory, but that it would produce greater revenues in excess of out-of-pocket costs than would the former higher rate. The reduced rate therefore will not be detrimental to the railroads' revenue requirements. In these circumstances and in light of the inadequacy of the Commission's report with respect to the recognition and preservation of inherent advantages, we are of the belief that New Haven provides no support for the Commission's order.

We also hold that the Commission has failed to state a rational basis to support its selection of the "fully-distributed" costs of the barge-truck mode as the floor for reduced railroad rates. The Commission said:

In short, by reducing its rate below the level of the barge-truck full costs, the respondent railroads have unlawfully impinged upon the ability of the barge-truck mode competitively to assert its inherent cost advantage. This action we cannot approve. To hold otherwise we would deprive barges from asserting an inherent cost advantage and we would deprive shippers of cheaper water transportation. Cf. Interstate Commerce Commission v. Mechling, 330 U.S. 567, 575–579, 67 S.Ct. 894, 91 L.Ed. 1102 (1947); Dixie Carriers, Inc. v. United States, 351 U.S. 56, 76 S.Ct. 578, 100 L.Ed. 934 (1956). (326 I.C.C. at 85).

How does the reduced railroad rate deprive shippers of cheaper water transportation? It appears to us to only provide shippers with an alternative form of transportation at an equivalent rate. The decisions cited by the Commission furnish no support for its conclusion, since none was concerned with Section 15a(3) or the setting of minimum rate floors. In *Mechling*, railroads carrying grain from Chicago to Eastern cities were charging more for carrying grain which arrived in Chicago by water carrier than for grain which arrived by rail. The Supreme Court upheld the Commission in finding that this action discriminating against water carriers violated § 3(4) of the Act. In *Dixie Carriers*, the railroads had refused to establish a joint rail-barge rate between two points in Texas. The Supreme Court held that this refusal constituted a discrimination in rates between connecting lines prohibited by § 3(4) of the Interstate Commerce Act, and that the Commission had a duty under § 307(d) to establish through routes and joint rates for rail-barge transportation. No such issue of discrimination is presented here.

We cannot escape the conclusion that the ultimate finding that the rates in issue are not just and reasonable was motivated by the Commission's desire to prevent any rate competition which threatens the continued existence of a competitor. In support of its determination to employ a comparison of "fully-distributed" costs to determine which mode possesses an inherent advantage, the Commission stated its belief that "an inherent cost advantage under the National Transportation Policy reasonably could not embrace a concept that would impair the ability of a carrier not only to compete but to exist" (326 I.C.C. at 82). This rationale is directly in conflict with the conclusion of the Supreme Court in *New Haven*. (See our last above quote of the Court from that case.)

It is our belief that the Commission's order is based upon a misinterpretation or misapplication of the relevant statutory provisions. We gain support from the legislation itself, its history, and its application in other recent cases. In Missouri Pacific R. R. Co. v. United States, 203 F.Supp. 629, 633 (E.D.Mo. 1962), a three-judge District Court stated:

"As far back as 1945, in the case of New Automobiles in Interstate Commerce, 259 I.C.C. 475, the Commission had said, l. c. 538:

'As Congress enacted separately stated ratemaking rules for each transport agency, it obviously intended that the rates of each such agency should be determined by us in each case according to the facts and circumstances attending the movement of the traffic by that agency. In other words, *there appears to be no warrant for believing that rail rates, for example, should be held up to a particular level to preserve a motor-rate structure, or vice versa.*' (Emphasis added.)

In spite of these words, the Commission had, in a line of cases through the early 1950's, often canceled reduced rates, though they were fully com-

pensatory. While the Commission has traditionally contended that such cancellations were not ordered to protect other modes, the Congress felt otherwise, and enacted Section 15a (3) at least in part as a direction to the Commission to treat competitive rate cases in a manner consistent with the language and spirit of New Automobiles."

We do not think there can be any doubt that the underlying purpose of Congress in enacting Section 15a (3) was to direct the Interstate Commerce Commission to observe the original intent of Congress in 1940 and to restore and adhere to the policy set forth in *New Automobiles* with respect to the preservation of inherent advantages. Both the Senate and House Committee Reports are explicit on this matter,[1] and there were also repeated statements of such an intent in the hearings and debates on Section 15a (3).[2] See Interstate Commerce Comm'n v. New York, N. H. &

H. R. R. Co., 372 U.S. 744, 755–756, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963).

There are indications that Congress believed the National Transportation Policy would not prevent carriers from establishing rates which exceeded out-of-pocket costs in the kind of situation here presented. For example, Congressman Wolverton, who was a member of the House Commerce Committee, which reported the bill, said that: "If each mode of transportation is permitted to have rates not below a compensatory figure so that competition can really exist, I think you are then preserving the rights, the inherent rights of each."[3] Congressman O'Hara, another member of the House Commerce Committee, stated that: "If [one] mode of transportation has a compensatory rate and it is lower than that of the competitor, the Interstate Commerce Commission would have to allow [it] to charge a lower rate." (104 Cong.Rec. 12536)[4] A list of "De-

---

1. The Senate Report, after stating it "agrees with and wishes to emphasize the import of" the Senate Subcommittee report, quotes the following from it:

> It nevertheless appears that the Interstate Commerce Commission has not been consistent in the past in allowing one or another of the several modes of transportation to assert their inherent advantages in the making of rates. The subcommittee recommends, therefore, that the Commission consistently follow the principle of allowing each mode of transportation to assert its inherent advantages, whether they be of service or of cost. In 1945 in New Automobiles in Interstate Commerce (259 I.C.C. 475), the subcommittee believes that the Commission properly construed the intent of Congress in this respect when it said:
>
> 'As Congress enacted separately stated rate-making rules for each transport agency, it obviously intended that the rates of each such agency should be determined by us in each case according to the facts and circumstances attending the movement of the traffic by that agency. In other words, there appears no warrant for believing that rail rates, for example, should be held up to a particular level to preserve a motor-rate structure, or vice versa' (259 I.C.C. at p. 238).

> The subcommittee wishes to affirm the interpretation of the Commission given in the Automobile case epitomized in the words quoted above. The subcommittee therefore believes it necessary to amend the act only so as, in effect, to admonish the Commission to be consistent in following the policy enunciated in the Automobile case thus assuring reasonable freedom in the making of competitive rates.

> The subcommittee anticipates that the broad effect of this amendment will be to encourage competition between the different modes of transportation to the benefit of the shipping public. S.Rep. No. 1647, 85th Cong., 2d Sess., pp. 2–3. The House Report is to the same effect. H.Rep. No. 1922, 85th Cong., 2d Sess., p. 14.

2. See, e. g., 104 Cong.Rec. 10842, 12531, 12532; Hearings on S. 3778 before the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess., pp. 14, 29, 178.

3. Hearings on Railroad Problems Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess., p. 409.

4. Senators Schoeppel, Lausche and Smathers likewise indicated that compensatory

cisions of the Interstate Commerce Commission in Which the Policy of the New Automobiles Case Has Not Been Followed", which was before Congress in 1958, likewise makes it plain that Congress was concerned about cases in which the Commission had declared reduced rates unlawful, although finding that they were compensatory. See Hearings on S. 3778 Before the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess., pp. 86–91, 174–175.

In a more general vein, the Committees reporting on the bill emphasized that the chief thrust of the amendment was to encourage competitive ratemaking among the different modes of carriage. The Report of the Senate Committee on Interstate and Foreign Commerce described Section 15a (3) as "designed to encourage competition * * * by allowing each form of transportation * * full opportunity to make rates reflecting the inherent advantages each has to offer * * *" and it expressed approval of the following language of the Supreme Court in Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957):

> The ability of one mode of transportation to operate with a rate lower than competing types of transportation is precisely the sort of 'inherent advantage' that the congressional policy requires the Commission to recognize.

S.Rep. No. 1647, 85th Cong., 2d Sess., p. 3; and see H.Rep. No. 1922, 85th Cong., 2d Sess., pp. 13–15.

We observe that the specific Congressional mandate in 1958 was that the Commission *should henceforth be bound in establishing minimum rates by the original intent of Congress in 1940* and the decision of the Commission in *New*

*Automobiles.* In *New Automobiles* the Commission conducted a general investigation of all rates subject to its jurisdiction applying to the transportation of new automobiles, including rates of various forms of rail, truck and water carriage. The motor carriers, who initiated the proceeding, alleged that rail reductions made on an out-of-pocket basis would deprive them of their inherent advantages which the Commission was obligated to preserve by the terms of the National Transportation Policy (259 I.C.C. 539), and asked the Commission "to lay down the principle that in meeting highway competition the railroads should in no instance go below the fully-distributed rail costs or the truck rates" (259 I.C.C. 530). The railroads, on the other hand, asked that they be left free to meet competition by reducing rates to whatever level was necessary in order to attract traffic, provided their rates exceeded out-of-pocket costs (Id. at 532–533).

In determining "the relative fitness of the various agencies of transportation" from a cost standpoint, the Commission there compared the railroads' out-of-pocket costs with the truck "full" costs, after finding that the truck "full" costs were substantially the same is its out-of-pocket costs (259 I.C.C. at 529). Upon this comparison, which essentially was of the two modes' out-of-pocket costs, the Commission found that for shorter distances the motor carriers were the low-cost agency, while for the longer distances the cost advantage was with the railroads. Finding that, "According to the cost studies the rates of the several forms are generally compensatory, except in scattered instances", it held that the rates exceeded a "reasonable minimum level" and were lawful. It defined a

---

rates should normally be permitted. Hearings on S. 3778 Before the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 2d Sess., pp. 11, 56 and 111. Moreover, we note that Congress specifically rejected a provision which would have prevented carriers from offering rates below fully-distributed costs in cases of inter-modal competition.

Senator Lausche indicated that the proposal, if adopted, "would completely negative the purposes and intent of the Congress in 1940 and in 1953 when it declared that the inherent advantages of each mode of transportation shall be preserved in the interest of the public". Hearings on S. 3778, supra, p. 26.

compensatory rate as "one which is remunerative, i. e., covers the out-of-pocket costs, as hereinbefore defined, of handling the particular traffic under consideration, including a proper return on investment".

Noting that "within reasonable limits the public is entitled to the reduced rates brought by competition", the Commission indicated that its decision carried out the intent of Congress.

Thus, in *New Automobiles*, the Commission indicated its understanding that Congress intended that carriers should normally be free to offer rates which were compensatory. This construction of the National Transportation Policy is clearly supported by the legislative history of the Transportation Act of 1940. Congress not only rejected all proposals which would have prevented carriers from offering compensatory rates which were below fully-distributed costs, including the so-called Miller-Wadsworth amendment,[5] but in so doing it made known its belief that such a restriction on competition would be extremely undesirable both from the standpoint of shippers and from the standpoint of the general public seeking the most efficient use of transportation resources.

For example, in explaining why the Miller-Wadsworth amendment was rejected, Congressman Wolverton, one of the managers of the bill in the House and a House conferee as well as a member of the House Commerce Committee, stated:

The amendment would not only slow up and seriously hamper all reductions but would absolutely prevent a great many desirable reductions from being made.

█ We believe that the Commission failed to take adequate account of the Congressional intent that carriers should normally be free to offer rates which are compensatory, i. e., above relevant out-of-pocket costs. Moreover, we think the Commission's decision here is inconsistent with its philosophy in *New Automobiles*. The Commission's order is therefore not in accordance with law.

We do not mean to suggest that there may not be situations where the Commission has power, under Section 15a (3) and the National Transportation Policy, to prohibit reduced rates even though they are compensatory. What

---

5. The so-called Miller-Wadsworth amendment to the minimum rate section would have provided:

In order that the public at large may enjoy the benefit and economy afforded by each type of transportation, the Commission shall permit each type of carrier or carriers to reduce rates so long as such rates maintain a compensatory return to the carrier or carriers after taking into consideration overhead and all other elements entering into the cost to the carrier or carriers for the services rendered. (84 Cong.Rec. 6074)

This amendment was included in the bills originally passed by the Senate and the House (84 Cong.Rec. 6074, 9962, 9977), but the Joint Conference Committee of the Senate and the House, to whom these bills were referred, eliminated it. Following lengthy debate, particularly in the House, as to whether it should be restored, ultimately both the Senate and the House voted not to restore it (86 Cong.Rec. 10193–94, 11766–11767). Various other proposals which were advanced to prohibit rates below fully-distributed costs in inter-modal competitive situations were also rejected. See H.R. 2531, 76th Cong., 1st Sess., sec. 41; Hearings on S. 1310 and S. 2016, S. 1869 and S. 2009 Before the Senate Committee on Interstate Commerce, 76th Cong., 1st Sess., p. 698.

* * * It is unnecessary that each individual rate, in order to be profitable, must bear its full share of all costs, including overhead, and produce a reasonable profit above such costs. If a rate is high enough to pay more than out-of-pocket operating expenses, it helps meet some of the constant overhead.

* * * We should do nothing that will unnecessarily prevent or delay rate reductions; strike a blow at the fundamental principle of rate making upon which this country was developed, and obstruct or hinder the free flow of commerce which is so essential to our economic welfare. (86 Cong.Rec. 10190–91)

And see 84 Cong.Rec. 9963, 9970; 86 Cong.Rec. 10179, 10187, 11766–11767.

we do suggest is that Congress has expressed a clear intent that reduced compensatory rates should normally be allowed and that the record here and the Commission's report supply no basis for disregarding that intent.

For the foregoing reasons, the order of the Commission in Ingot Molds, Pa. to Steelton, Ky., 326 I.C.C. 77 (1965), is hereby set aside and permanently enjoined and the matter is remanded to the Commission for action not inconsistent with this opinion.