**ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al.,**
**Plaintiffs,**
**Turner Brothers Trucking Co., Inc., Wales Trucking Company and B. F. Walker, Inc., Intervening Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission,**
**Defendants,**

**Waterways Freight Bureau, American Commercial Lines, Inc., Federal Barge Lines, Inc., A. L. Mechling Barge Line, Inc., the Valley Line Company, the Ohio River Company, Sioux City & New Orleans Barge Lines, Inc., Union Barge Line Corporation, Intervening Defendants.**

**No. 68 C 2090.**

United States District Court
N. D. Illinois, E. D.
June 27, 1969.

Thomas O. Broker, Roanoke, Va., Charles W. Chapman, St. Louis, Mo., Jack T. Clark, Cleveland, Ohio, Edward R. Gustafson, Harvey Huston, Chicago, Ill., W. Bruce Kopper, St. Louis, Mo., George M. Mariner, Chicago, Ill., Richard J. Murphy, Philadelphia, Pa., Charles C. Rettberg, Jr., Cleveland, Ohio, for plaintiffs.

Richard W. McLaren, Asst. Atty. Gen., Thomas A. Foran, U. S. Atty., Daniel Lynch & Bernhard, John H. D. Wigger, Washington, D. C., for defendants.

Robert W. Ginnane, General Counsel, and Barry Roberts, Washington, D. C., for Interstate Commerce Commission.

Before KERNER, Circuit Judge, and HOFFMAN and NAPOLI, District Judges.

NAPOLI, District Judge.

This is an action brought by thirteen railroads to enjoin reports (dated April 5, 1966 and September 17, 1968) and an order (dated September 17, 1968) of the Interstate Commerce Commission. The order ended joint rail-truck rates on oil country iron and steel pipe transportation which discriminated against connecting barge traffic. An earlier action between these parties, 66 C 2371, arising out of the report of April 5, 1966, had been filed in this Court on December 27, 1966, but was dismissed without prejudice when the Commission reopened the proceedings. Thereafter, the Commission issued its report and order of September 17, 1968, 332 ICC 540, ending the discriminatory rates and dismissing the motor carriers. On November 8, 1968, the instant complaint was filed and the Commission voluntarily postponed the effective date of its order pending the outcome of this case. Three highway motor carriers have intervened as additional plaintiffs and the Waterways Freight Bureau and seven of its members have intervened as additional defendants.

The pipe used in Texas and Oklahoma oilfields is manufactured in the steel centers of the Northern States. From there it is moved either by water carriers or Eastern railroads to transfer points in Missouri and then by Western railroads to storage points in Oklahoma and finally by truck to the oilfields. Some pipe is switched to Western railroads while still in the north, but all pipe is eventually trucked to the oilfields. The Commission found that, under the joint rates agreed to by the railroads and the motor carriers, the railroads were charging more to carry the pipe to Oklahoma when it was transport-

ed the first leg of the trip by barge than when it was transported by train and that this additional cost was not entirely justified by the added costs of transferring the shipment from barge to train.

The complaint and the arguments of plaintiffs' counsel were grounded upon only two contentions: that the Commission had no jurisdiction over these joint rates and that in measuring the discrimination involved the Commission failed to give proper weight to the added costs of handling barge traffic.

In deciding the case our first reference must be to the Interstate Commerce Act, 49 U.S.C. § 1 et seq. The original Act, passed in 1887, governs rail transportation by common carrier and forms Part I of the present Act. Part II of the Act, added in 1935, governs transportation by motor vehicle. Part III, added in 1940, governs transportation by water. In the past these three parts of the Act have been construed as separate and independent systems. It is on this theory that plaintiffs base their case. The plaintiffs contend that the Commission's concern with this case should be limited to Part II of the Act, and that the limitation is part of the statutory scheme. It is Section 216(c) of Part II, 49 U.S.C. § 316(c) that enables railroads and trucking concerns to enter into joint rates. Prior to its enactment in 1935, joint rates were not permitted because trucking was not regulated. We see nothing in the argument that because joint rates are allowed under Part II of the Act, the sections in Part I dealing with discriminatory rates, namely Sections 3(4) and 4(1), are inapplicable to joint rates. We could not agree with such a limited construction of the Act.

We do not ground our decision on the contention that the movement of pipe was one over which the Interstate Commerce Commission had statutory authority because it was simply a railroad shipment from the steel centers to the Oklahoma storage points. While there is impressive authority by which we could base our decision on this narrower

ground, it is not illogical to hold that, if the Commission can regulate rates of rail traffic from A to B which discriminate against barge traffic, then it can regulate joint rail-truck rates of rail traffic from A to B, the proportionate share of which discriminates against barge traffic, and truck traffic from B to C. There is, of course, a long line of cases prohibiting discrimination in railroad rates and joint water-rail rates against ex-barge traffic.

Interstate Commerce Commission v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947), held invalid a Commission order approving higher rates for grain moving out of Chicago if it had come in by barge rather than by rail. The Court pointed out that in the debate over the enactment of Part III of the Act, bringing water carriers under Interstate Commerce Commission jurisdiction, "opponents were repeatedly assured by sponsors of the 1940 Act * * * that the questioned legislation unequivocally required the Commission to fix rates which would preserve for shippers the inherent advantages of barge transportation: lower cost of equipment, operation, and therefore service." Id. at 575, 67 S.Ct. at 898. It is true that Section 3(4) of Part I had been specifically amended by the 1940 Act to include water carriers within the definition of connecting carriers. However, much of the underlying rationale of *Mechling* is applicable to the instant case.

The basic error of the Commission here is that it seemed to act on the assumption that the congressional prohibitions of railroad rate discriminations against water carriers were not applicable to such discriminations if accomplished by through rates. But this assumption would permit the destruction or curtailment of the advantages to shippers of cheap barge transportation whenever the transported goods were carried beyond the end of the barge line. *Id.* at 577, 67 S.Ct. at 899.

In Dixie Carriers, Inc. v. United States, 351 U.S. 56, 76 S.Ct. 578, 100 L.

Ed. 934 (1956), the Court reviewed the Commission's dismissal of a complaint requesting the establishment of joint rail-barge rates on a par with joint all-rail rates for carrying sulphur. The Court commented at page 59, 76 S.Ct. at page 580:

The *Mechling* case involved an attempt to deprive water transportation of one of its "inherent advantages," as that phrase is used in the preamble of the 1940 Act, (49 U.S.C.A. note preceding section 1,) by increasing the cost of barge service. The Commission's present decision achieves the same result through the device of a joint rate allowed carriers by rail but denied carriers by water. * * * Barge transportation frequently covers only one segment of the journey to market. The failure of the railroads to establish nondiscriminatory joint rates with barges might, therefore, seriously impair the development of barge service as a vital component of our national transportation system. Section 3 outlaws discrimination in all its forms.

In Arrow Transportation Co. v. United States, 176 F.Supp. 411 (N.D. Ala. 1959), aff'd. per curiam, State Corp. Commission of Kansas v. Arrow Transportation Co. 361 U.S. 353, 80 S.Ct. 406, 4 L.Ed.2d 362, the District Court held that the Commission had no authority to approve ex-barge rates which deprived shippers of their savings accrued through the use of barge service. The Court termed the case "another chapter in the conflict between the requirement of the National Transportation Policy that the provisions of the Interstate Commerce Act be administered in such a way as to preserve the inherent advantages of water transportation and the desire of the railroads to offset those advantages by refusing to accord to traffic received from a connecting barge line the same treatment accorded to traffic received from connecting railroads." Id. at 415–416. The Court concluded its discussion of discriminatory rates at page 418 as follows:

The differences upon which the Commission finally rests its holding is [sic] one of the form in which the rates are published, but the decisions of the Supreme Court in Mechling and Dixie Carriers make it abundantly clear that carriers cannot hide their discrimination against ex-barge traffic behind the veil of a through rate any more than they can charge a higher proportional rate on ex-barge than on ex-rail traffic. The thrust of the Mechling-Dixie rationale goes much deeper than form—it makes clear that Congress imposed a duty upon the Commission to eliminate discrimination in whatever guise or form it exists.

■ While the order before us could be sustained on these cases alone, which condemn the discrimination against ex-barge traffic, we do not base our decision solely on them. We agree with plaintiffs that those cases are not directly controlling of the situation before us, which can be considered a case of first impression. However, there is additional support for defendants' position in an additional line of cases which we must regard not only as controlling but even dispositive of the case before us. They are the cases that hold that because of the National Transportation Policy the various Parts of the Interstate Commerce Act may be, indeed, must be construed as a whole.

The National Transportation Policy of 1940 amended the Interstate Commerce Act by adding at the outset the following provision, 49 U.S.C. preceding § 1:

It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; * * * to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive compe-

titive practices; \* \* \* all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.

In New York Central R.R. Co. v. United States, 267 F.Supp. 619 (S.D.N.Y. 1967) the National Transportation Policy and one of the sections of the Act were treated as if they could be at odds.

> [T]he provision in question [is not] a broad statement of policy which Congress has assigned to the Commission for detailed interpretation. [Citation omitted] The provisions of the National Transportation Policy are the statutory guide furnished by Congress to the Commission [as] the policy of Congress \* \* \*. What we are dealing with in Section 4(1) is a detailed, specific, prophylactic regulation, without technical language which would require expertise in the field for its interpretation. Id. at 625–626.

Moreover, the court did not follow the National Transportation Policy in holding that motor-rail rates were not subject to § 4 which prohibits higher rates for short hauls than the rates for long hauls over the same route. The majority was not inclined toward a liberal construction of the Act. The Court found at page 626:

> That, under Section 1(1) (a), Part I would not apply to motor-rail transportation where the rail portion was wholly within one state although the motor transportation crossed state lines. Part II would cover any motor-rail transportation crossing state lines. While this omission in Part I may be of minimal practical effect, if Congress had intended to regulate any phase of motor-rail transportation under Part I it would hardly have made such an arbitrary exception intention-

ally. On the other hand, in view of the tight draftsmanship on the face of the statute and the number of revisions to which the statute as a whole has been subjected, the exception is probably not an oversight. \* \* \*

> Certainly the provisions of Part II dealing with combined motor-rail operations on their face form a complete, self-contained system of regulation which includes protection against the evil dealt with in Section 4(1).

The error in these conclusions is ably pointed out by Judge Friendly in his dissenting opinion.

> The basis for the railroads' claim of inapplicability of the fourth section is that the lower rates for the longer hauls in which they participate are joint rail-motor rates, and thus not for transportation "wholly by railroad." But the statute does not say they have to be. Section 4(1) reads on carriers subject to Part I and Part III, not on transportation subject to these parts \* \* \* however the case might stand if the rate to the prejudiced point was a joint rail-motor rate and the lower rate to the farther point was all rail or, more pertinently, if both were joint rail-motor rates, I fail to see why the language is not broad enough to cover any arrangement whereby a railroad participates in a lower interstate rate to a more than to a less distant point \* \* \*.

> It squares ill with Congress' devotion to the long and short haul principle to suppose that by authorizing joint rail-motor rates, it meant to give rail carriers a franchise thus to charge a lower rate to a more distant point they had not effectively possessed before; as said by Commissioner Freas, "there is no suggestion" in § 216(c), "or in its legislative history, that such a provision was intended to afford a railroad a device by which, merely by joining with a motor carrier for the performance of a short portion of its haul under a joint-rate arrangement, the former could escape the regulatory provisions of the act otherwise appli-

cable to rates maintained by railroads," 326 ICC at 459.

The New York Central case was not appealed. However, there are two Supreme Court decisions to the contrary, "Seatrain" and "Piggyback". "Seatrain" is the common name for United States v. Pennsylvania R.R., 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499 (1945), which was not discussed in New York Central. "Piggyback" is the common name for American Trucking Ass'n, Inc. v. Atchison, Topeka & Santa Fe R.R., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), which was decided only a month and a day after New York Central and reversed a decision which had been relied upon in the latter, Atchison, Topeka & Santa Fe R.R. Co. v. United States, 244 F.Supp. 955 (N.D.Ill.1965).

"Seatrain" held that the Interstate Commerce Commission had the authority to require railroads to interchange their cars with connecting water carriers. The Court outlined the breadth of the Act when construed in light of the National Transportation Policy:

> True, Congress has specified with precise language some obligations which railroads must assume. But all legislation dealing with this problem since the first Act in 1887, 24 Stat. 379, has contained broad language to indicate the scope of the law. The very complexities of the subject have necessarily caused Congress to cast its regulatory provisions in general terms. Congress has, in general, left the contents of these terms to be spelled out in particular cases by administrative and judicial action, and in the light of the Congressional purpose to foster an efficient and fair national transportation system. [Citations omitted]
> The 1940 Transportation Act is divided into three parts, the first relating to railroads, the second to motor vehicles, and the third to water carriers. That Act, as had each previous amendment of the original 1887 Act, expanded the scope of regulation in this field and correlatively broadened the Commission's powers. The inter-

relationship of the three parts of the Act was made manifest by its declaration of a "national transportation policy * * *." United States v. Pennsylvania R.R., supra at 616 of 323 U. S., at 473 of 65 S.Ct.

We cannot agree with the contention that the Commission has less power now to protect water carriers than it had in 1914. The 1940 Act was intended, together with the old law, to provide a completely integrated interstate regulatory system over motor, railroad, and water carriers. Id. at 617–619, 65 S.Ct. at 474.

"Piggyback" held that the Commission had the authority to make rules that railroads shall not discriminate in the offer of bimodal transportation. In 1962 the Commission instituted an investigation of trailer-on-flatcar or piggyback service. The rules that were the outcome of the investigation were the subject of the case. The Commission ordered that when the railroads offered their own TOFC or piggyback service to the public generally they also had to offer their facilities to motor and water carriers. In deciding the case the Court reiterated the "Seatrain" rationale:

> In Seatrain, this Court emphatically rejected the analysis upon which the District Court here essentially based its position—that since the Act regulates rail, motor, and water carriers separately, in Titles I, II, and III, the Commission may not compel the mutual furnishing of services and facilities other than as expressly directed. Recognizing that in the case of water carriers (as distinguished from motor carriers), the Act specifically directs railroads to establish through routes with them, the Court held that this is not the end of the railroads' obligation or the limit of the Commission's power. * * *

In view of this, we cannot accept arguments based upon arguable inference from nonspecific statutory language, limiting the Commission's power to adopt rules which, essentially, reflect its judgment in light of cur-

rent facts as to the proper interrelationship of several modes of transportation with respect to an important new development. For .example, § 216(c), 49 U.S.C. § 316(c), authorizes the railroads to enter into voluntary arrangements for through routes and joint rates with motor carriers. There is no Commission power to compel the railroads to do so, and it is argued from this we should derive a congressional intent that the ICC may not compel the railroads to furnish services to the motor carriers in any circumstances. There is no basis for this vast leap from a particular authorization to a pervasive prohibition. American Trucking Ass'n Inc. v. Atchison, Topeka & Santa Fe R. R., *supra* at 409, 410–411 of 387 U.S., at 1615–1616 of 87 S.Ct.

Finally, the Court concluded:

> In the absence of congressional direction, there is no basis for denying to the ICC the power to allocate and regulate transportation that partakes of both [rail and truck] elements; and there is no basis whatever for denying to the Commission the power to carry out its responsibilities under the National Transportation Policy * * *. Id. at 421, 87 S.Ct. at 1621.

While some may argue that the "Piggyback" decision is limited to questions of transportation rather than rates, the language of the decision was drafted in broad and sweeping resolve. The same logic that is found in that case of giving added breadth to an Act which covers three major modes of commercial transportation—water, truck and rail—must be used when a question of analogy arises under that Act which also involves transportation, carriers and rates. To take the whole in one instance implies that we take the whole in a like situation.

■ A holding that the Commission is powerless to regulate discrimination in joint rail-truck rates simply because parties voluntarily entered into these rates under a provision in Part II of the Act or because trucks are not specifically designated connecting carriers under Part I of the Act would fly in the face of the National Transportation Policy. Such a holding could not be ascribed as the intent of Congress. We are compelled to hold, therefore, that under the language of the National Transportation Policy and of the Interstate Commerce Act that joint rail-truck rates are to be regulated pursuant to Section 3(4) of Part I of the Act.

Moreover, our discussion and the cases cited above are as applicable to the question of regulating joint rail-truck rates under Section 4(1) of Part I of the Act, the high rate-short haul provision. Therefore, we also must hold that the Commission can, within its statutory grant, exercise jurisdiction over these rates under this provision.

■■ Finally we are left with plaintiffs' second argument that the Commission erred in failing to give proper weight to the additional costs which would be incurred in handling barge-rail traffic. This argument seems to border on the oft-made request that courts review and reevaluate the evidence before the Commission. This we will not do. If the argument is, on the other hand, merely that there is no substantial evidence in the record to support the conclusions of the Commission, that argument is without weight. We have carefully examined the record and find substantial and ample evidence to sustain the findings of the Commission.

A decree will be entered for the defendants in accordance with the foregoing.